In re Timothy J. McCOY, Debtor.

Richard E. JAMES, Plaintiff,

v.

Timothy J. McCOY, Defendant.

Bankruptcy No. 2–88–05343.
Adv. No. 2–89–0057.

United States Bankruptcy Court,
S.D. Ohio, E.D.

May 10, 1990.

Lee C. Mittman, Columbus, Ohio, for debtor/defendant.

Richard K. Stovall, Thompson, Hine and Flory, Columbus, Ohio, for plaintiff.

Charles M. Caldwell, Office of U.S. Trustee, Columbus, Ohio, Asst. U.S. Trustee.

## OPINION AND ORDER ON COMPLAINT OBJECTING TO DISCHARGE AND DISCHARGEABILITY OF DEBT

R. GUY COLE, Jr., Bankruptcy Judge.

### I. Preliminary Matters

This submitted proceeding is before the Court following the trial of a complaint filed by Richard E. James, objecting to the discharge of, and dischargeability of a debt owed by, the debtor, Timothy J. McCoy. The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This is a core proceeding which the Court may hear and determine in accordance with 28 U.S.C. § 157(b)(2)(I) and (J). This opinion and order shall constitute the Court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

### II. Findings of Fact

The parties have submitted proposed findings of fact. Based upon those submissions, the Court makes the following factual findings:

#### A. *Background*

1. Plaintiff, Richard E. James ("James") initiated this adversary proceeding, seeking to have the Debtor's debt to him determined to be nondischargeable under 11 U.S.C. § 523(a)(2)(A) and § 523(a)(6), and seeking a judgment denying the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(3) and § 727(a)(4)(A). James is a creditor of Timothy J. McCoy ("Debtor") by virtue of certain obligations arising from the Debtor's purchase of a business, in Mount Vernon, Ohio, known as The Appliance Repair Center ("ARC"). This matter was tried to the Court on December 4–6, 1989.

2. James' career has been devoted to the repair of household appliances. James

formed ARC in 1966 and operated it as a sole proprietorship. ARC was engaged in the business of repairing appliances; it did not sell either new or used appliances because of potential conflicts with appliance dealers upon whom ARC relied for repair business.

3. In 1976, Debtor obtained employment with ARC in connection with his high school's vocational education program. Debtor terminated his employment with ARC upon graduation from high school. On or about December, 1981, Debtor became re-employed with ARC in a full-time capacity as parts' manager. Debtor's duties as parts' manager included *inter alia,* the maintenance of inventory levels and credits, and the distribution of parts to technicians. Debtor's duties as parts' manager, and later as co-manager of ARC, included the ordering of inventory.

4. Upon his return to ARC in December, 1981, Debtor informed James that Debtor and his father, Eugene McCoy, intended to form an appliance sales' business. James and Debtor thereupon began preliminary discussions concerning James' sale of ARC to the Debtor and his father.

5. The Debtor, along with other family members, formed The Appliance Center of Mt. Vernon, Inc. ("ACMV") in June, 1982, for the purpose of retail sales of appliances. The original shareholders of ACMV were the Debtor and his wife, Teresa McCoy; Debtor's parents, Eugene and Sylvia McCoy; and Teresa McCoy's parents, Ronald and Marilyn Rodehaver. All six shareholders maintained an equal ownership interest in ACMV. In 1982 or 1983, the Rodehavers sold their ACMV shares to the other four shareholders. As of November, 1983, the corporate shares of ACMV were held by Debtor, his wife, and Debtor's parents, each of whom owned a 25 percent ownership interest.

6. James leased contiguous floor space to ACMV or Debtor for the operation of ACMV's appliance sales' business. There was no physical separation of the respective operations of ARC and ACMV until 1983, when an internal wall was constructed as a divider of the two businesses.

ACMV commenced business by purchasing appliances from various retailers offering them for sale in December, 1982.

7. James believed that the owners of ACMV in the fall of 1982 were the Debtor, his wife, and the Debtor's parents (collectively the "McCoys"). James first learned that the aforementioned four family members were owners of ACMV through advertisements in a local newspaper which carried pictures of all four McCoys as the "owners" of ACMV during the Christmas selling season in 1982. Following the release of the newspaper advertisements reflecting such ownership of ACMV, James confirmed that "all four McCoys" owned ACMV through discussions he had with the McCoys. Transcript I–22–23.

## B. *The Sales Agreements*

8. On November 2, 1982, James and Debtor executed a Sales Agreement for the sale of ARC by James to Debtor for the purchase price of $130,000. Plaintiff's. Exh. 1. The Sales Agreement provided for the purchase-sale to close no earlier that January 1, 1985, and no later than January 1, 1988. Plaintiff's. Exh. 1, para. 2. The Sales Agreement contained no representations regarding the Debtor's ownership of an interest in ACMV or limiting his right to transfer his interest in ARC.

9. Upon the execution of the Sales Agreement in November, 1982, Debtor became a co-manager of ARC; however, no operational changes occurred in the daily functioning of the business. During Debtor's course of employment as co-manager of ARC, Debtor was operating ACMV in the same building. The simultaneous operation of ACMV and ARC, and ACMV's entry into the repair business, caused considerable friction between James and the Debtor.

10. The proposed sale of ARC by James to Debtor did not close under the timetables provided in the November, 1982, Sales Agreement. On April 25, 1984, James and the Debtor executed a Modification of Sales 'Agreement (the "Modified Sales Agreement"). Plaintiff's. Exh. 2. The Modified Sales Agreement provided that the sale of

ARC to the Debtor was to close on May 25, 1984. It further provided for a revised purchase price in the amount of $134,500. Plaintiff's. Exh. 2, para. 1. The revised purchase price of $134,500 was determined by a physical inventory of ARC undertaken in 1983 at the Debtor's request. Under the Sales Agreement, ARC's inventory was simply to be maintained at an acceptable level. Plaintiff's. Exh. 1, para. 15. Similar to the original Sales Agreement, the Modified Sales Agreement contained no provisions regarding the Debtor's ownership interest in ACMV or limiting his right to transfer his interest in ARC.

11. Further, the Modified Sales Agreement contained a provision prohibiting James from "engaging in, or in any way concern himself with, the business of [Debtor], directly or indirectly, within the counties of Knox, Muskingum, Licking or Morrow, in the State of Ohio" for a period of five years from the date of closing of the contract. Plaintiff's Exh. 1, para. 12; Plaintiff's Exh. 2, para. 4.

12. The Modified Sales Agreement also called for the transfer of various vehicles from James to Debtor upon Debtor's assumption of the indebtedness on those vehicles. Plaintiff's. Exh. 2. Excluded from such transfers was a 1980 Dodge van on which James was to retain the original certificate of title as security until the Debtor paid James the sum of $2,200, at which time James would release his "lien." James and Debtor executed a Security Agreement in favor of James, listing this vehicle as collateral for Debtor's obligations. James retained the original certificate of title, but never received the $2,200 payment. Plaintiff's. Exhs. 10, 11. Debtor, however, executed a lost-title affidavit on May 16, 1985, affirming that the original certificate had been lost and that the vehicle was unencumbered; and, as a result, obtained a certified copy of the original title in his own name. Plaintiff's. Exhs. 123, 13, 14, 15. The Debtor's testimony that he believed the original certificate of title had been lost and that no liens existed as to this vehicle was not credible.

13. On April 25, 1984, the sale of ARC from James to McCoy occurred in accordance with the terms of the Modified Sales Agreement. At that time, McCoy executed a promissory note ("Note") in the face amount of $116,500 in favor of James which required the following installment payments: $25,000 due on May 25, 1984; $25,000 due on May 25, 1985; $25,000 due on May 25, 1986; $24,000 due on May 25, 1987; and, $17,500 due on May 25, 1989, with interest at the rate of 12 percent per annum from May 25, 1984 Plaintiff's. Exh. 3. As further consideration for the purchase of ARC, the Modified Sales Agreement required Debtor to maintain a life insurance policy on James in an amount not less than the lesser of $75,000 or the unpaid balance on the Note until it was paid in full. Plaintiff's. Exh. 1, para. 18; Plaintiff's. Exh. 4. Debtor also agreed to reimburse James for health insurance premiums in the amount of $235.88 per month with the first payment being due on May 25, 1984, and subsequent payments being due on the twenty-fifth of each month thereafter until James was eligible for Medicare benefits, or until January 1, 1993, whichever occurred first. Plaintiff's. Exh. 2.

14. On May 25, 1984, James and Debtor executed a Closing Agreement for Debtor's purchase of ARC from James. Plaintiff's. Exh. 4. At the time of the execution of the Closing Agreement, Debtor paid James the first installment of $25,000 due under the Modified Sales Agreement and Note. McCoy also paid the first monthly health insurance payment in the amount of $235.88.

15. James received monthly interest payments from Debtor as due under the Note from the date of the closing through and including April, 1985. James also received health insurance payments from Debtor from the date of the closing in the amount of $235.88 per month through and including February, 1988. The life insurance policy maintained by the Debtor on James was cancelled in March, 1988. The principal installment of $25,000 due on May 25, 1985, along with the monthly interest due at that time, were not paid. James has

not received any other payments of principal or interest due under the Note. James paid $570.43 in 1988 to reinstate his life insurance policy and $1,059 in 1989 to maintain life insurance coverage.

16. The principal balance due under the Note, including interest through November, 1989, is $158,159.65. The amount due for continued health insurance coverage from and including March, 1988, through and including December, 1992, is $11,-558.11. The out-of-pocket life insurance expenses owed James by the Debtor are $1,629.43. James will not be eligible for Medicare benefits until after January 1, 1993.

## C. *Incidents of Ownership*

17. As of November, 1983, Debtor held a 25 percent ownership interest in ACMV. Debtor's testimony that he transferred his stock in ACMV to his wife as a gift for Christmas is not credible. Debtor does not recall handing or exchanging any paper representing the stock ownership to his wife. There was no change in the operations of ACMV by virtue of Debtor's purported transfer of his 25 percent ownership interest to his wife. Debtor did not inform James of the transfer of this stock interest nor does he believe he advised anyone else of the transfer. Debtor's alleged transfer of his interest in ACMV was motivated by his desire to minimize or eliminate personal assets from which James could satisfy any claim existing or arising from his purchase of ARC.

18. Debtor told James in the late fall or early winter of 1982 that he was an owner of ACMV. James believed that Debtor maintained an ownership interest in ACMV since the date it was formed through the entire course of negotiations regarding the sale of ARC. Debtor's representations were calculated to make James believe, as he did, that the Debtor was an owner of ACMV on April 25 and May 25, 1984. Further, Debtor's family members also led James to believe Debtor maintained an ownership interest in ACMV. In July, 1983, Eugene McCoy told James of such ownership. Also, Teresa McCoy "bragged" about both her and Debtor's ownership of ACMV on various occasions in the fall of 1983. Transcript I–50–53. Additionally, several newspaper and telephone advertisements sponsored by ACMV in local newspapers indicated that the Debtor possessed an ownership interest in ACMV. The combination of these various representations and circumstances reinforced James' belief that Debtor was an owner of ACMV.

19. On February 26, 1985, a newspaper article appeared in the business section of the Mt. Vernon News wherein the following passage appeared:

> The Appliance Center sells many top named-brand appliances but as always owner Tim McCoy says much emphasis is placed on service to customers. [They] 'will service all makes and brands,' said McCoy, 'including Sears, Whirlpool, Montgomery Ward and Maytag appliances, just to name a few.'

Plaintiff's. Exh. 5 (emphasis supplied). The newspaper article also contained a picture of Debtor, his wife, and his parents, with the caption of that picture setting forth those individuals as owners of ACMV. Plaintiff's. Exh. 5. The author of the article, Richard Burson, a journalist with the Mt. Vernon News, prepared the article. In preparing the advertisement, Burson interviewed Debtor approximately one week prior to the publication date. Burson stated it was the policy of the newspaper to submit for the client's review a final draft of a business-page feature, such as this article, since it was a paid advertisement. Burson specifically recalled that either Debtor or his wife reviewed and approved this particular article prior to its publication in the newspaper.

20. The Mt. Vernon, Ohio, telephone book issued December, 1984, at page 5 of the yellow pages' advertising section, contains a joint, combined advertisement for ACMV and ARC. Plaintiff's Exh. 6. The bottom right-hand corner of the advertisement contains the reference: "Owners Tim and Teresa, Eugene and Sylvia McCoy." Plaintiff's. Exh. 5. Debtor also testified as to the Form 1120, U.S. income tax return of

ACMV for the year ending December 31, 1983. Plaintiff's. Exh. 17. Page 2, Schedule E, of that tax return reflects that Debtor owned a 25–percent stock interest in ACMV as of the year ending December 31, 1983. Plaintiff's Exh. 17.

21: Debtor continued to hold himself out to the public and the employees of ACMV as an owner of ACMV until January, 1986, at which time he accepted employment with White Consolidated Industries ("WCI"). It was at this time that James first surmised that the Debtor might not have an ownership interest in ACMV.

22. Carl Bagent, a former employee of ACMV, and once an employee of ARC, attended a meeting held in April, 1984, for all ACMV employees immediately following the consolidation of ACMV's various operations at one location—1057 Coshocton Avenue, the address where ARC initially conducted its business. Debtor "headed up" the discussions and stated that he and his wife were the new owners of ACMV. Transcript I–172–75. Bagent attended a subsequent meeting of ACMV employees in January, 1986, at which Debtor stated that he was taking a job with WCI and that he "turned over his share of interest" [sic] in ACMV to his wife and that she would be running ACMV from that point forward. Transcript I–178. This was the first time Debtor had indicated to Bagent that he had transferred his stock interest in ACMV to his wife.

23. James would not have sold ARC to Debtor in April, 1984, if he knew that Debtor did not maintain an ownership interest in ACMV. James perceived that ACMV was profitable based upon a conversation James had with Debtor in September of 1983 and the amount of appliances James witnessed being sold by ACMV. James' perception of ACMV's profitability continued into 1984. James believed Debtor would satisfy his indebtedness under the Note from the profits of both ARC and ACMV. There was, however, no such requirement that the Note be satisfied by the profits of ACMV in the Modified Sales Agreement or Closing Agreement, or any other writing, nor was the matter expressly discussed between James and Debtor. Likewise, there is no evidence that Debtor intended to, or overtly represented that he would, satisfy his obligations to James from the proceeds of sale or repair of appliances.

### D. *Sale of ARC to ACMV*

24. On April 25, 1984, the date Debtor and James executed the Modified Sales Agreement, Debtor immediately transferred the business assets of ARC to ACMV. This transfer of the ARC business assets to ACMV occurred before Debtor made any payment to James under the Modified Sales Agreement. Debtor testified that the terms of the sale of ARC to ACMV were a "mirror image" of Debtor's purchase of ARC from James. Transcript I–126, 131–32.

25. Debtor testified that ACMV was to pay McCoy the "same figures that were in the contract to Richard James" and that it was a "mirror image" purchase; that is, just as Debtor was to pay James, ACMV was to pay Debtor. Transcript I–126, 132. Debtor later testified, however, that there were no actual dates as to when ACMV was to pay Debtor for the purchase of ARC. ACMV was obligated, the Debtor believed, to pay "as they could" on the obligation. Transcript I–145. The Debtor also testified that he believed that if he asked ACMV for payment under the contract, and if ACMV did not pay, then Debtor would have a right to sue ACMV. Debtor further testified that ACMV interpreted the terms of its purchase of ARC in that manner inasmuch as Debtor was president of ACMV. The Court finds that Debtor's testimony with respect to the terms of the sale of ARC to ACMV is not credible.

26. According to the Debtor, the initial $25,000 payment he made to James on May 25, 1984, was received by Debtor from ACMV. Eugene McCoy "gave" the $25,000 to ACMV which in turn paid Debtor. Transcript I–131–32. ACMV also paid Debtor the monthly interest and insurance payments which Debtor was obligated to pay James under the Modified Sales Agreement. Debtor further recalls two payments of $13,000 and $16,000 which he

believes he received sometime in 1984 or 1985. ACMV has not made any other payments to Debtor relative to its purchase of ARC. Debtor has never attempted to collect the balance due him from ACMV relative to its purchase of ARC. Debtor stated that if ACMV had not paid him, he could not have paid James either in 1984, 1985 or 1989.

27. The purported transfer of ARC from Debtor to ACMV was a wholly-undocumented transaction. No documents were executed by either Debtor or ACMV reflecting the transfer. There was, for example, no bill of sale, no promissory note, no security agreement and no closing statement. Debtor is not aware of any corporate minutes or other records prepared documenting the sale. Although Debtor testified that he and his father discussed his intent to sell ARC to ACMV, there was no meeting held of the shareholders or directors of ACMV to approve such a sale. Debtor testified that during the month of April, 1984, when final negotiations on the Modified Sales Agreement were taking place, Debtor spoke with his father who indicated that ACMV's purchase of ARC was "fine." Transcript I–128. Debtor does not believe he ever discussed the sale with his mother.

28. Debtor's mother, Sylvia McCoy, is a shareholder, director, and the secretary of ACMV. Sylvia McCoy dep. 7. As secretary, Sylvia McCoy is responsible for the transcription and maintenance of the written minutes of ACMV's corporate meetings. Sylvia McCoy was not aware of ACMV's purchase of ARC from Debtor, and does not recall a meeting of the shareholders to discuss that sale. As secretary, she probably would have taken minutes at such a meeting if one had taken place.

29. In her position as secretary of ACMV, Sylvia McCoy recorded the minutes of ACMV's corporate meetings on the following dates: October 3, 1983, regarding the purchase of Hoagland Electric; April 4, 1984, requiring the manager of ACMV to reside in the apartment above the business; May 31, 1985, authorizing the transfer of various vehicle titles; and, January 1, 1986,

regarding Debtor's resignation. Sylvia McCoy dep. 16, 18 and 19. None of these minutes authorize or otherwise reflect ACMV's purchase, or agreement to purchase, ARC.

30. Debtor's father was aware that ACMV purchased ARC from his son, although he does not remember that the sale to ACMV was specifically authorized. McCoy dep. 11, 16.

31. The Court finds that Debtor's testimony regarding his wife's knowledge of the sale of ARC to ACMV is not credible. First, Debtor testified that his wife "knew all about" the sale of ARC to ACMV as a result of his discussions with his father. Transcript I–127. Debtor further testified that he talked to his wife about the sale in an "about-way." Transcript I–128. Subsequently, when questioned as to her knowledge, Debtor responded that she might have heard him talking to his father regarding the sale, although Debtor does not know that for a fact. Debtor surmised that his wife may have heard the discussion because she was "in the house, she could be walking past, [and] she knows I am talking to my father." Transcript I–128–29. Debtor later testified that his discussions with his father were actually a single telephone conversation which took place in Debtor's house on Love Road, Fredericktown, Ohio. As a result, his wife might have heard him talking on the telephone as she "walked past" but could not hear his father at the other end of the line. Moreover, Debtor conceded that his wife could not have known with certainty if his father was at the other end of the telephone conversation.

32. Debtor never told James of the sale of ARC to ACMV nor does he recall informing anyone else other than his father, or his wife by virtue of the fact that she may have overheard discussions with his father. Since all payments received by James were made and written on the Debtor's personal checking account, James would have had no way of knowing that ACMV had purchased ARC.

33. Although there is no evidence that Debtor made any such express representa-

tion, James assumed that Debtor would retain ownership of ARC. James would not have sold ARC to Debtor if he knew that Debtor would immediately sell or transfer ARC to ACMV. In James' opinion, it would be much more profitable for ARC to remain as a sole proprietorship given the financial incentives attributable to the servicing, or repair, business.

### E. *Other Transfers*

34. The Court finds that between November, 1983, and May, 1985, Debtor purposely transferred nearly all his assets to his wife without fair consideration, and with the intent to hinder, delay and defraud James. Debtor transferred his stock interests in Cooper Industries, Wendys and Ponderosa to his wife in 1984, purportedly as a Christmas gift. Debtor also transferred his 25 percent ownership interest in ACMV to his wife in December, 1983, again purportedly as a Christmas gift. In April or May of 1985, Debtor transferred his shareholder interest in an entity known as Newark Magnavox to his wife, purportedly as an anniversary gift. Debtor's wife testified as to these various gifts of stock interests and confirmed they were in fact gifts from her husband. She stated that Debtor did not physically present her with a stock certificate representing his 25 percent interest in ACMV in December, 1983, but rather simply told her that he was giving his shares to her. Teresa McCoy also stated that her husband gave her 25 shares of Newark Magnavox stock which represented a one-third ownership interest in that entity in either the spring or summer of 1985. She claims the Newark Magnavox stock was not an anniversary gift; however, her receipt of a 1981 automobile was an anniversary gift from her husband.

35. ACMV owned a 1981 Chevrolet van which it purchased on February 29, 1984. The lien on the van was cancelled on April 26, 1985. Plaintiff's. Exh. 18. On May 16, 1985, Debtor, as president of ACMV, assigned the van to himself, individually, for no consideration. Plaintiff's. Exh. 18, 20. On May 17, 1985, Debtor transferred the van to his wife as a gift. Plaintiff's. Exh. 19, 20.

36. Debtor owned various vehicles between November, 1983, and May 25, 1984, but never more than two at any one point in time. Only one vehicle was unencumbered by a lien, but Debtor believed it was traded in for the Chevrolet truck which was encumbered.

37. Debtor and his wife jointly owned a house on Love Road in Fredericktown, Ohio, which they sold in May or June of 1984. The existing mortgage was assumed by the buyers and a promissory note was given in favor of Teresa McCoy only, for $10,000 or $15,000, representing the equity in the house. Debtor testified that he chose not to have his name on the aforementioned promissory note.

38. The only other assets Debtor owned from November, 1983, through May, 1984, constituted household furniture primarily consisting of beds and bedding, which had the same value as listed in his bankruptcy schedules. The Court, having taken judicial notice of the schedules, finds that the Debtor has subscribed a value of $1,500 to his household goods. Debtor stated he had savings and checking accounts, and believes that the largest amount of money in such accounts during that time would have been less than $10,000. All of these accounts, however, were joint accounts with his wife. Debtor does not recall having any other items of value during the aforementioned time period.

39. Curtis Olson, a former employee of both ARC and ACMV, testified that he was an original shareholder in Newark Magnavox with Debtor and Debtor's father. Newark Magnavox was formed in the late fall of 1984, and its doors opened in February or March of 1985. It sold and repaired appliances in Newark, Ohio. Sometime during the fall of 1985, Olson had lunch with Debtor and a sales representative from White Westinghouse. At that lunch, Debtor told Olson that he gave his shares of stock in Newark Magnavox to his wife. Olson stated that Debtor told him that he made this transfer in order to prevent James and any action James might have against Debtor from interfering with the

business of Newark Magnavox. Transcript I–167.

### F. *Non-competition Agreement*

40. Debtor testified that he believed James started competing with him in the appliance repair business in violation of the Modified Sales Agreement in the summer or fall of 1984. Debtor claims he consulted his attorney about the problem at that time. Debtor testified, however, that it was not until May 25, 1985, that he decided not to make the $25,000 installment due James on that date.

41. Teresa McCoy testified that ACMV ceased paying Debtor for the purchase of ARC because of its belief that James violated a non-competition agreement. She further testified she knew in early 1985 that her husband was having problems with James regarding the non-competition contract issue. On May 25, 1986, however, ACMV paid Debtor $15,500 on this account even though ACMV still believed the competition issue to have been unresolved. Plaintiff's Exh. B.

### G. *Other Findings*

42. The Court finds that the debt owed James from Debtor is the only "non-contingent" debt listed in Debtor's Chapter 7 schedules. All other creditors of the Debtor are creditors of ACMV representing debts on which ACMV is primarily liable and on which Debtor is a guarantor. ACMV is presently servicing all of these debts and has not sought, nor is there any evidence it intends to seek, relief in the bankruptcy court. No demand has been made upon Debtor from any of the listed creditors with the exception of Vendor Funding, but Debtor believes that demand may have been made after he had filed his Chapter 7 bankruptcy case; and, in any event, the Vendor Funding obligation has been "worked out."

43. Debtor had several discussions with his father regarding the purchase of ARC from James prior to the November, 1982, Sales Agreement. Eugene McCoy dep. 28; dep. Exhs. 1, 2, 3. Eugene McCoy testified that Deposition Exhibit 4 consisted of notes he maintained in his possession which reflected a conversation he had with his son on September 27, 1982. Eugene McCoy dep. 34. Deposition Exhibit 4 contains the following notations of that conversation:

Talked with PES, Jr. He suggested the possibility of going ahead but getting most things in Teresa's name so Tim would not lose much if he could not get the necessary money to buy out Richard when he wanted to be bought out.

Eugene McCoy identified "PES, Jr." as Mr. Paul Spurgeon, Jr., an attorney who represented ACMV at that time. Eugene McCoy dep. 34.

44. The Court finds that, from as early as September 1982, Debtor embarked upon a scheme to divest himself of all assets which could serve to satisfy a claim or judgment by James. In furtherance of his fraudulent scheme, Debtor transferred most of his assets to his wife for less-than-fair consideration. His explanations for the transfers, *e.g.* that they were gifts, are not credible. The divestiture and transfer of assets were made for the sole purpose of delaying, hindering, or defrauding James in the collection of any claim James might have against McCoy from the purchase-sale of ARC. The aforementioned transfers damaged James in the sum of $171,347.19.

### Conclusions of Law

### A. *11 U.S.C. § 523(a)(2)(A)*

James requests that the Court enter an order pursuant to 11 U.S.C. § 523(a)(2)(A), excepting from discharge the debt incurred by McCoy. Title 11 U.S.C. § 523(a)(2)(A) states, in relevant part as follows:

a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

.  .  .  .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or insider's financial condition . . .

In an action brought pursuant to § 523(a)(2)(A), the plaintiff must demonstrate by clear and convincing evidence that the Debtor obtained property by false pretenses, false representations, or actual fraud. *Coman v. Phillips (In re Phillips),* 804 F.2d 930 (6th Cir.1986). In *Phillips,* the Sixth Circuit specified the following five criteria which must be satisfied in order to establish that a challenged debt is nondischargeable: (1) a representation was made by the debtor that was material, (2) the representation was false or was made with gross disregard as to its truth, (3) the debtor intended to deceive, (4) the creditor reasonably relied on the false representation, and (5) the creditor suffered a loss. *Phillips,* 804 F.2d at 932.

As stated, James bears the burden of proving his allegations against the debtor by clear and convincing evidence. The clear and convincing standard of proof is an intermediate standard which requires that the plaintiff establish a fact to lesser degree than beyond a reasonable doubt, but to a greater degree than by a mere preponderance of the evidence. Precisely stated, clear and convincing evidence consists of evidence which implants in the mind of the trier of fact "a firm belief or conviction as to the allegations sought to be established." *Hagedorn v. First Nat'l. Bank of Cincinnati (In re Hagedorn),* 25 B.R. 666, 668 (1982); *Hobson v. Eaton,* 399 F.2d 781, 784 N. 2 (6th Cir.1968); *cert. denied,* 394 U.S. 928, 89 S.Ct. 1189, 22 L.Ed.2d 459 (1969).

In keeping with the purpose and spirit of the Bankruptcy Code, exceptions to the general rule of dischargeability of debts are to be strictly construed in favor of the debtor. *Eisen v. Linn (In re Linn),* 38 B.R. 762 (9th Cir. B.A.P.1984); *Lake County Dept. of Welfare v. Manno (In re Manno),* 29 B.R. 797 (N.D.Ind.1983). The exceptions to dischargeability must be narrowly construed and confined to those plainly expressed in the Code. *Financial Collection Agencies v. Norman (In re Norman),* 25 B.R. 545 (Bankr.S.C.Cal. 1982). This is done to effectuate the fresh start policy of the Bankruptcy Code. *Con-gress Financial Corp. v. Levitan (In re Levitan),* 46 B.R. 380 (Bankr.E.D.N.Y. 1985); *ITT Diversified Credit Corp. v. Nicoll (In re Nicoll),* 42 B.R. 87 (Bankr.N.D. Ill.1984). Accordingly, a plaintiff asserting a claim under § 523(a)(2)(A), must clearly and convincingly demonstrate that property was obtained by false pretenses, a false representation, or actual fraud. The statute, having been framed in the disjunctive, requires a showing of only one of the three offending conducts.

An intent to deceive may logically be inferred from a false representation or false pretense which the debtor knows or should know will induce another individual to part with property (or services). *First Nat'l. Bank v. Kimzey,* 761 F.2d 421, 424 (7th Cir.1985). A "false pretense" involves an implied misrepresentation or conduct intended to create or foster a false impression. *Howard & Sons, Inc. v. Schmidt (In re Schmidt),* 70 B.R. 634, 640 (Bankr.W.D. Ind.1986); *Minority Equity Capital Corp. v. Weinstein (Matter of Weinstein),* 31 B.R. 804, 805 (Bankr.E.D.N.Y.1983). A false pretense has been defined to include a "mute charade," where the debtor's conduct is designed to convey an impression without oral representation. *In re Thomas,* 12 B.R. 765, 769 (Bankr.N.D.Ga.1981). A "false representation," on the other hand, is an expressed misrepresentation. It need not be a written misrepresentation; oral misrepresentations have been found to be actionable. *In re Falk of Bethlehem,* 3 B.R. 266, 274 (Bankr D.N.J.1980); *See* L. King, 3 *Collier on Bankruptcy,* Para. 523.-08, 523–48 (15th ed. 1989). Even a debtor's silence may constitute a materially false misrepresentation prohibiting discharge of the indebtedness.

While the debtor's testimony may not establish actual intent, because a debtor is unlikely to testify directly that his intent was fraudulent, the courts may deduce the requisite intent from all the facts and circumstances. *In re Devers,* 759 F.2d 751, 754 (9th Cir.1985); *L.B. Cleveland, Inc. v. Bluestone (In re Bluestone),* 102 B.R. 103 (Bankr.N.D.Ohio 1989). Courts have uniformly agreed that one must ex-

amine the totality of the circumstances, including circumstantial evidence and inferences drawn from a debtor's course of conduct, in ascertaining the existence of fraud or fraudulent intentions. *Beverly Enterprise v. Eversole (In re Eversole)*, 110 B.R. 318 (Bankr.S.D.1990). *See, e.g., Farmer's Co-operative Assoc. v. Strunk*, 671 F.2d 391, 395 (10th Cir.1982). Therefore, viewing the totality of the circumstances, it is painfully obvious that the Debtor, conspiring with his wife and parents, plotted this fraudulent scheme prior to, or at the time of, agreeing to purchase ARC from James. The Debtor and his family continued this scheme through 1986, when it was unveiled.

The facts clearly demonstrate that the Debtor purchased ARC from James by false pretenses, false representations, and actual fraud. The false pretenses include, as a part of Debtor's overall scheme, his false impression and mute charade concerning his ownership interest in ARC and ACMV.[1] This conduct was specifically designed to assure James that Debtor had the financial resources to repay a significant obligation. The actual fraud included Debtor's charade, as well as his secretive transfer of all, or nearly all, of his assets out of his name and principally into his wife's name. Debtor continued this charade to James and the rest of the public until 1986, at the earliest.

The Debtor knew that the pretenses and representations were both material and false. This is not the case of a businessman who merely sought to protect assets, or minimize financial exposure, in connection with prospective business dealings. On the contrary, the Debtor made the aforementioned false representations and committed fraud with the specific intent to deceive James and no one else. James reasonably relied on Debtor's representations, although he would acknowledge, the Court suspects, that his actions with respect to the sale of ARC evidence a lack of prudence. James sustained a loss in the amount of $171,347.19 as a result of his reliance.

The Court observes further that, to some extent, the fraud continues. Having examined the conduct and demeanor of the Debtor and his wife in nearly three days of trial, the Court is convinced that the Debtor and his wife were not truthful. The Court does not know whether the simple review of the trial transcript will show the deceptive, inconsistent and unbelievable testimony provided by the Debtor and his wife. If not, it certainly was obvious to the Court at the time of trial. On the other hand, James' testimony was credible, and his actions with respect to the sale of ARC were reasonable even if they could have been more prudent.

Considering the totality of the circumstances, and the elements required for proof under § 523(a)(2)(A), the Court concludes that the Debtor's debt to James is nondischargeable.

### B. *11 U.S.C. § 523(a)(6)*

■ James asserts that he and his property were willfully and maliciously injured by the Debtor's conduct and that, therefore, § 523(a)(6) precludes discharge of the debt. Section 523(a)(6) excepts from discharge any debt:

> [F]or willful and malicious injury by the debtor to another entity or to the property of another entity; ...

To fall within the purview of § 523(a)(6), the injury to an entity or property must have been willful *and* malicious. *See* L. King, 3 *Collier on Bankruptcy*, Para. 523.-16[1], 523–117 (15th ed. 1989) (emphasis added). This category of liabilities excepted from discharge "contemplates something more restricted than malice in the broader sense," and covers all cases in which the facts of intent and malice are judicially ascertained, irrespective of the character of the allegations made by the parties. L. King, 3 *Collier on Bankrupt-*

---

1. While the Court acknowledges that representations made by other parties, specifically the Debtor's wife and the McCoys, are not material in the Court's analysis of § 523(a)(2)(A), the Court believes these representations are pertinent in gaining a comprehensive understanding of the Debtor's overall scheme.

*cy,* Para. 523.16[1], 523–117 (15th ed. 1989) citing *Flanders v. Mullins,* 80 Vt. 124, 66 A. 789 (1907).

The Sixth Circuit Court of Appeals, in *Wheeler v. Laudani,* 783 F.2d 610 (6th Cir.1986), has addressed the meaning of "willful" and "malicious". Citing to the legislative history accompanying § 523(a)(6), the Sixth Circuit determined that willful refers to a deliberate or intentional act. *Id.* at 615. *See* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 365 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6320; S.Rep. No. 59–989, 95th Cong., 2d Sess. 79 (1978), 1978 U.S. Code Cong. & Admin.News 5787, 5865. The court then focused on the proper definition of malicious to be applied under § 523(a)(6). The court concluded that malicious means "in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *Wheeler,* 783 F.2d at 615 (citation omitted). *See also, Shepherd v Darsey (In re Darsey),* 93 B.R. 299 (Bankr.M.D.Ga.1988).

Relying on the Tenth Circuit's decision in *In re Franklin,* 726 F.2d 606 (10th Cir. 1984), the Sixth Circuit subsequently stated that "willful" and "malicious" require the intentional doing of an act that necessarily leads to injury. *Perkins v. Scharffe,* 817 F.2d 392, 394 (6th Cir.1987), *cert. denied,* 484 U.S. 853, 108 S.Ct. 156, 98 L.Ed.2d 112. Suffice it to say, a wrongful act done intentionally, which necessarily produces harm and is without just cause or excuse, may fall within the parameters of § 523(a)(6) of the Bankruptcy Code.

■ Examining the Debtor's conduct under this standard, it is clear that the Debtor intended to harm James. The scheme, which has been described herein in great detail, had both the intent and effect of injuring James. That scheme was willful and malicious, and carried out with considerable aforethought. Debtor knew, or should have known, that the scheme would have the injurious effect that it eventually imposed.

For the foregoing reasons, the Court finds that Debtor's debt to James is nondis-

chargeable by virtue of § 523(a)(6). The Court finds further that James was injured in the amount of $171,347.19.

## C. *11 U.S.C. § 727(a)(3), and (a)(4)*

■ James also has requested this Court to deny the Debtor's discharge pursuant to § 727(a)(3) and § 727(a)(4)(A) of the Bankruptcy Code. Sections 727(a)(3) provides, in relevant part that the debtor shall be granted a discharge unless he has:

(3) "Concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information ... from which the debtor's financial condition or business transactions might be ascertained."

(4) "[H]e knowingly and fraudulently, in or connection with the case—

(a) made a false oath or account; ..."

While § 727(a)(3) could be interpreted in a draconian fashion to require maintenance, preservation, and production of comprehensive records of every minute detail of a debtor's financial and business activity as a precondition to a grant of discharge, the weight of decisional authority unequivocally demonstrates that such an interpretation is wholly inappropriate. *Rhoades v. Wikle,* 453 F.2d 51, 53 (9th Cir.1971) (Act case); *Peoples State Bank v. Drenckhahn (In re Drenckhahn),* 77 B.R. 697, 707 (Bankr.D. Minn.1987); *First Nat'l. Bank v. Williams (In re Williams),* 62 B.R. 590, 593 (Bankr. N.D.Tex.1986); *Broad Nat'l. Bank v. Kadison,* 26 B.R. 1015, 1018 (Bankr.D.N.J. 1983). Unquestionably, the purpose of the statute is to "assure ... the trustee and creditors that they will be provided with sufficient information with which they can assess the debtor's estate and general financial posture." *Schultz v. Shapiro (In re Shapiro),* 59 B.R. 844, 847–48 (Bankr.E. D.N.Y.1986). To this end, the debtor must keep and preserve books and records in a reasonably intelligent fashion in order to obtain a discharge in bankruptcy. *In re Kottwitz,* 42 B.R. 566, 567 (Bankr. W.D. Mo.1984). The court must view the adequacy of the debtor's books and records, for the purposes of § 727(a)(3), on a case-by-case basis, according to the special characteristics of the debtor's occupation, busi-

ness, and personal financial structure. *Leverage Leasing Corp. v. Reitz (In re Reitz)*, 69 B.R. 192, 197 (N.D.Ill.1986); *In re Williams*, 62 B.R. at 593; *Rea v. Hogard (In re Hogard)*, 43 B.R. 590, 594 (Bankr.D.Minn.1984).

While the Court recognizes that many debtors do not keep or preserve organized records, this case presents a scenario where records were not maintained for the express purposes of hindering, delaying and defrauding James in the collection of his claim. The Debtor deliberately failed to maintain records because such recording would constitute written evidence, to a great extent, of the fraud perpetrated. It also might have exposed the fraud sooner. The Debtor's testimony at trial was riddled with false accounts, untruths, half-truths and inconsistencies about his business records, as well as those of ACMV. It was not testimony resulting from forgetfulness, it was testimony attempting to explain a fraudulent scheme.

A discharge relieves the debtor of legal responsibilities for all debts deemed dischargeable and provides the debtor with a "fresh start." However, bankruptcy relief, and its accompanying discharge, are reserved for the honest debtor. Timothy J. McCoy is not an honest debtor to whom a discharge should be granted.

In light of the Debtor's course of conduct, continuing through the trial, this Court does not believe that he is entitled to a bankruptcy discharge. Accordingly, his discharge is specifically prohibited by § 727(a)(3) of the Bankruptcy Code. With respect to the claim brought pursuant to § 727(a)(4), the Court will not address this issue as it has determined that the Debtor's discharge should be denied pursuant to § 727(a)(3).

### Conclusion

For the foregoing reasons, the debt to James is determined to be nondischargeable. Likewise, Debtor's request for a discharge in bankruptcy is hereby denied.

IT IS SO ORDERED.