In re William WALTON, Joyce Walton, Debtors.

**AG CREDIT, ACA, Plaintiff,**

v.

**William WALTON, et al., Defendants.**

**Bankruptcy No. 92–30440.
Adv. No. 92–3146.**

United States Bankruptcy Court,
N.D. Ohio, W.D.

March 2, 1994.

---

**8.** Defendant does not concede that the assessment had to be made on or before August 7, 1989.

John J. Hunter, Jr., Toledo, OH, for Ag Credit.

Malcolm Goodman, Marion, OH, Trustee.

### OPINION AND ORDER EXCEPTING DEBT FROM DISCHARGE AND DENYING DISCHARGE

WALTER J. KRASNIEWSKI,
Bankruptcy Judge.

This matter is before the Court on Ag Credit ACA's ("Bank") complaint to deny William J. and Joyce D. Walton (the "Waltons") a discharge pursuant to 11 U.S.C. § 727(a)(2)(A) and (a)(3). The Bank also seeks to except a $700,000 loan (the "Loan") from the Bank to the Waltons from discharge pursuant to 11 U.S.C. § 523(a)(2)(B). The Court finds that the Loan should be excepted from discharge. The Court further finds that the Waltons should be denied a discharge.

### FACTS

On December 30, 1991, Joyce D. Walton ("JDW") filed a voluntary petition under chapter 7 of title 11. Joyce Walton's husband William J. Walton (the "Debtor") filed a voluntary petition under chapter 7 of title 11 on February 10, 1992. These cases were

consolidated on the Waltons' request on March 13, 1992, and all further entries docketed in Case No. 92–30440.

### Exception of Debt From Discharge Under 11 U.S.C. § 523(a)(2)(B)

The Bank argues that the Loan should be excepted from discharge because the Waltons provided the Bank with materially false financial information in obtaining the Loan upon which the Bank reasonably relied in extending the Loan. At trial, the Bank provided statements of financial condition signed by the Waltons which lists certain apartments that the Waltons purported to own (the "Apartments") at the time of the Loan. *See* Plaintiff's Exhibits 5, 6, 7. The Bank also provided a "Balance Sheet" for the Apartments which was supplied to the Bank by the Waltons. *See* Plaintiff's Exhibit 4. This balance sheet lists 1983 net income for the Apartments of $37,399.17 and January, 1984 income of $4,304.55. The Debtor admits that the Waltons never owned the Apartments.

The Waltons obtained the Loan from a predecessor of Ag Credit. The Court shall hereinafter refer to both Ag Credit and its predecessor as the Bank.

The Bank presented the testimony of several current and former Bank employees in support of its complaint to except the Loan from discharge.

Alice Beers ("Beers"), an employee of the Bank, testified that prior to the Loan, the Waltons had "always been good borrowers".

Beers testified that, at the time of the Loan, the Bank calculated a borrower's loan eligibility as the borrower's "income reserve". The borrower's income reserve is calculated as the borrower's gross income minus certain expenses minus machinery replacement costs. Beers testified that it was the Bank's policy that a borrower could not obtain a loan if the borrower's income reserve was less than 10% of gross income.

Brad Thibaut ("Thibaut"), a former employee of the Bank, testified that he was a loan officer trainee at the Bank at the inception of the Loan.

Thibaut testified that William Walton (the "Debtor") sought a loan from the Bank for $700,000 in January of 1984. Thibaut further testified that the Bank requested and received further financial data from the Debtor, as the initial financial data which the Debtor provided was inadequate. *See* Plaintiff's Exhibit 9. Thibaut testified that the financial data which the Bank requested from the Debtor was typical of that which was requested from other borrowers.

At trial, Thibaut stated that the Debtor orally represented that he owned the Apartments. Thibaut further testified that, in response to the Bank's inquiry, the Debtor provided the Bank with a "Balance Sheet" for the Apartments which listed income for 1983 from the Apartments as $37,399.17. *See* Plaintiff's Exhibit 4.

Thibaut testified, consistent with Beers' testimony, that the Bank determined a borrower's loan eligibility based upon the borrower's "income remainder". The "income remainder" was calculated as gross income minus certain expenses minus machinery replacement costs. Thibaut testified that borrowers who had an income remainder of less than 10% of gross income were not recommended for a loan.

Thibaut testified that the Bank calculated the Waltons' income remainder as 11.5% of gross income based upon the data provided by the Waltons, including the income figure provided for the Apartments which were purportedly owned by the Waltons.

Thibaut testified that if the Waltons' income remainder had been calculated without consideration of the income from the Apartments, the income remainder would have approximated 3.4%. Thus, Thibaut testified that if the financial data provided by the Waltons had not included the income figure for the Apartments, he would not have recommended approval of the Loan.

Thibaut also testified that at the time that the Bank was considering extending the Loan to the Waltons it was not the Bank's policy to conduct title searches on property which did not represent collateral for a loan, such as the Apartments. According to Thibaut, the loan to appraised value ratio and the debt to asset ratio for the Loan were

within the policy guidelines established by the Bank.

The Bank also provided the testimony of Steven Lemke ("Lemke") who was the president of a Bank affiliate and a loan officer for the Bank at the time the Bank extended the Loan.

Lemke testified that the Debtor discussed his purported ownership of the Apartments with Lemke in some detail at the Debtor's home prior to the closing of the Loan. Lemke testified that he had visited the Waltons' home after the Debtor expressed concerns with the level of disclosure required by the Bank to process the Waltons' loan application. Although Lemke testified that the Loan was discussed during this meeting, Lemke stated that the primary purpose of his visit to the Walton home was to "mend fences" with the Debtor who had several loans with the Bank.

Lemke further testified that the Debtor represented that he owned 100% of the Apartments. Lemke stated that he did not recall the Debtor mentioning any contingencies with regard to his purported ownership of the Apartments.

Lemke further corroborated the testimony of Beers and Thibaut as to the "income remainder" calculation performed by the Bank at the time of the Loan.

In deciding whether to extend the Loan, Lemke testified that he relied upon the financial data provided by the Debtor to the Bank including the "balance sheet" for the Apartments and the Waltons' statements of financial condition. *See* Plaintiff's Exhibits 4, 5, 6, 7. Lemke testified that the loan to asset value ratio and the Waltons' debt to asset ratio were within the policy limits set by the Bank. Lemke testified that if the Bank had calculated the Waltons' "income remainder" without the purported income from the Apartments, he would not have recommended that the Loan be extended. Lemke further testified that, at the time that the Bank extended the Loan, the Bank did not conduct title searches for property which did not represent collateral for a loan, such as the Apartments.

Christopher Rose ("Rose"), a senior assistant vice president with the Bank, testified that he was familiar with the loans which the Bank has made to the Waltons as he has worked in the area of "special accounts" such as the Waltons which are severely delinquent. Rose provided summaries of deficiency judgments which the Bank has obtained against the Waltons. *See* Exhibits 12, 13, 14.

Rose testified that as a result of a title search performed a number of years subsequent to the date of the Loan, the Bank learned that the Waltons were not the fee owners of the Apartments at the time that the Waltons received the Loan from the Bank. *See also* Plaintiff's Exhibit 15.

**Denial of a Discharge Under 11 U.S.C. § 727(a)(2)(A)**

The Bank also argues that JDW made a fraudulent transfer to her sons within one year of the filing of her petition. Rose testified at trial that he became aware of documents evidencing a purported transfer from the Waltons to their sons during the course of litigation brought by Stephan Walton against the Bank in Hancock County, Ohio.

The Bank introduced a copy of an agreement dated January 4, 1991 between the Debtor and JDW, and Meijer Properties, Inc. (the "Meijer Agreement") at trial. The Debtor verified that the signature contained in the Meijer Agreement was his signature. He further acknowledged that another signature on this document "looked like" his wife's signature. According to the terms of the Meijer Agreement, the Debtor and JDW agreed to abandon their appeal from a state court foreclosure proceeding in exchange for payment of $75,000.00 by Meijer Properties, Inc. *See* Plaintiff's Exhibit 20.

The Bank further introduced a copy of an agreement dated January 5, 1991 between the Debtor and JDW, and Stephan, Jonathan and Frederick Walton (the "Walton Agreement"). The Debtor identified his signature on this document and indicated that another signature on the document "looked like" JDW's signature. The Walton Agreement purports to convey the Debtor's and JDW's right to payment under the Meijer Agreement to Stephan, Jonathan and Frederick Walton. The Debtor acknowledged at trial

that Stephan, Jonathan and Frederick Walton provided no consideration to the Debtor and JDW in exchange for the right to receive the $75,000.00 payment under the Meijer Agreement.

According to Rose, the Waltons' right to payment of $75,000.00 under the Meijer Agreement was attached by the Bank.

**Denial of a Discharge Under 11 U.S.C. § 727(a)(3)**

The Bank also provided Rose's testimony and certain documentary evidence in support of its complaint to deny the Waltons a discharge.

Rose testified that in 1986 the Waltons were still actively engaged in operating a 2,500 acre farm.

Rose further testified that he was present at the foreclosure sale in May, 1992 of a 5 acre parcel of property which included the home that the Waltons occupied prior to the foreclosure sale (the "Homestead"). According to Rose, the Bank paid $125,000.00 for the Homestead at the foreclosure sale. Rose further testified that the Debtor made an unsuccessful bid on the Homestead at the foreclosure sale.

According to Rose, JDW exercised a "right of first refusal" which she possessed on the Homestead and purchased the Homestead.

The Bank quitclaimed the Homestead to JDW on October 8, 1992. *See* Plaintiff's Exhibit 29.

JDW subsequently quitclaimed the Homestead to Ron Roberts on October 9, 1992 (the "Roberts Deed"). *See* Plaintiff's Exhibit 27. The Debtor joined in conveying the Roberts Deed. Thereafter on October 13, 1992, JDW conveyed a mortgage on the Homestead to L. McGuire (the "McGuire Mortgage") which secured a loan to JDW in the amount of $118,753.00. *See* Plaintiff's Exhibit 28.

Rose testified that the Bank became aware of several business trips taken by the Debtor after 1986 during the course of a deposition in a state court proceeding. The Bank provided copies of airplane tickets indicating that the Debtor had traveled to Miami, Las Vegas and the Turks and Caicos Islands (the "Tickets"). *See* Plaintiff's Exhibit 17. The

Debtor stated that he did not pay for the Tickets and that his transportation was furnished in exchange for his consulting services.

Rose further testified that he was present at a debtor's examination of the Debtor conducted in state case 90–CV–89 during 1990. Rose testified that the Debtor stated during the debtor's exam that he has no income and relies on "good christian friends" to support him. Rose further testified that the Debtor was unable to furnish any documentation indicating how he and JDW have been able to support themselves since 1986.

## DISCUSSION

**Burden of Proof**

◼ The Bank bears the burden of proof by the preponderance of the evidence on its complaint to deny the Waltons a discharge and on its complaint to except the Loan from discharge. *See* Fed.R.Bankr.P. 4005 (plaintiff has burden of proof on complaint objecting to discharge); *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (plaintiff bears burden of proof on complaint to except debt from discharge by the preponderance of the evidence).

**Exception of Debt From Discharge Under 11 U.S.C. § 523(a)(2)(B)**

◼ Section 523(a)(2)(B) excepts a debt from discharge which has been obtained by the:

use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's ... financial condition

(iii) on which the creditor to whom the debtor is liable for ... money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with the intent to deceive[.]

11 U.S.C. § 523(a)(2)(B).

The financial statements which the Waltons submitted to the Bank in obtaining the Loan were materially misstated. The Waltons admit that they never owned the Apartments. Despite this fact, the Waltons repre-

sented to the Bank that they owned the Apartments, which had a purported net worth of $366,704.00. Additionally, the Waltons' represented to the Bank that the Apartments provided them with income of $37,399.17 for 1983.

These written statements were made with the degree of gross recklessness from which this Court will infer an intent to defraud. *See Coman v. Phillips (In re Phillips)*, 804 F.2d 930, 933–34 (6th Cir.1986) ("inferr[ing] that the [debtors] knowingly made a materially false representation" where the debtors "admit[ted] that they knew the purpose of a mortgage deed and that they knew the deed description was inaccurate").

Moreover, the Bank provided substantial evidence at trial that its reliance on the Waltons' financial statements was not "so unreasonable as to defeat a finding of reliance in fact". *Bank One, Lexington v. Woolum (In re Woolum)*, 979 F.2d 71, 76 (6th Cir.1985). Specifically, the Bank provided the testimony of Lemke and Thibaut that the Waltons' purported income from the Apartments, as stated in the "Balance Sheet" furnished by the Waltons, represented a substantial factor in their decision to recommend that the Loan be approved. *See* Plaintiff's Exhibit 4. Additionally, Lemke testified that he relied upon the Waltons' statements of financial condition in recommending that the Loan be approved. *See* Plaintiff's Exhibits 5, 6, 7.

Therefore, the Court finds that the Loan should be excepted from discharge.

**Denial of a Discharge Under 11 U.S.C. 727(a)(2)(A)**

■ The Court further finds that JDW should be denied a discharge because she transferred property with the intent to defraud creditors within one year before the date of the filing of her petition in bankruptcy.

The Walton Agreement which transferred the Waltons' interest in the Meijer Agreement to their sons was executed within one year before the date of the filing of JDW's bankruptcy petition on December 30, 1991. The Debtor stated at trial that neither he nor JDW received any consideration in transfer-

ring the right to payment under the Meijer Agreement to their sons.

■ Furthermore, the facts compel the conclusion that JDW possessed the intent to defraud her creditors when she executed the Walton Agreement. It is axiomatic that a debtor's intent to defraud can be inferred from a debtor's actions. *See Ingersoll v. Kriseman (In re Ingersoll)*, 124 B.R. 116 (M.D.Fla.1991) (finding intent to defraud where debtor made gratuitous transfer to father within two months of institution of legal proceedings by creditor); *c.f. National City Bank, Marion v. McNamara (In re McNamara)*, 89 B.R. 648, 651 (Bankr. N.D.Ohio 1988) (noting that a court should apply a "badges of fraud" analysis in determining whether a debtor had the intent to conceal property from creditors under § 727(a)(2)(A)). The fact that JDW transferred her interest in the Meijer Agreement to her sons for no consideration at a time when she had substantial judgments against her supports a finding that JDW intended to defraud her creditors. *See* Plaintiff's Exhibits 11, 12, 13, 14.

■ The mere fact that JDW's conveyance to her sons in the Walton Agreement did not result in actual injury to creditors is irrelevant in determining whether JDW should be denied a discharge. *Davis v. Davis (In re Davis)*, 911 F.2d 560 (11th Cir.1990) (Per curiam) (denial of discharge warranted where debtor transferred interest in house to wife within one year before filing petition notwithstanding the fact that the property was subsequently retransferred to the debtor); *c.f. First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1343 (9th Cir.1986) (stating that "lack of injury to creditors is irrelevant for purposes of denying a discharge in bankruptcy") (citations omitted).

**Denial of Discharge Under 11 U.S.C. 727(a)(3)**

■ The Court also finds that both the Debtor and JDW should be denied a discharge under § 727(a)(3) because their failure to keep any recorded information regarding their financial condition was not justified under all of the circumstances of the case.

A bankruptcy court should deny a debtor a discharge under § 727(a)(3) where:

> the debtor has ... failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

The Waltons admit that they have kept no records since 1986. Nevertheless, the Waltons argue that they are not required to produce any records.

▪ Bankruptcy courts have decided whether a debtor has maintained adequate records on a case-by-case basis. *James v. McCoy (In re McCoy)*, 114 B.R. 489 (Bankr. S.D.Ohio 1990). A debtor's duty to keep records "extends to all material business transactions of the debtor, including those pertaining to another's property". *Office of Comptroller General of Republic of Bolivia on Behalf of General Command of Bolivian Air Force v. Tractman*, 107 B.R. 24, 26 (S.D.N.Y.1989). Notwithstanding this requirement, § 727(a)(3) does not operate "in a draconian fashion to require maintenance, preservation, and production of comprehensive records of every minute detail of a debtor's financial and business activity as a precondition to a grant of discharge". *James*, 114 B.R. at 500.

▪ In deciding the amount of information which a debtor must provide, the Court must examine the debtor's:

(a) occupation

(b) financial structure

(c) education

(d) experience

(e) sophistication

(f) other factors which the court may look to in the interest of justice.

*United States v. Trogdon (In re Trogdon)*, 111 B.R. 655, 658 (Bankr.N.D.Ohio 1990) (citations omitted); *c.f. Meridian Bank v. Alten*, 958 F.2d 1226, 1231 (3rd Cir.1992) (stating that "[t]he issue of justification depends largely on what a normal, reasonable person would do under similar circumstances")

(quoting *In re Wilson*, 33 B.R. 689, 692 (Bankr.M.D.Ga.1983)).

The facts adduced at the hearing on this matter indicate that both the Debtor and JDW were required to produce records in order to permit their creditors and this Court to determine the state of their financial affairs.

The Waltons ran a large farming operation at one time and had a relatively complex financial structure. *See* Plaintiff's Exhibit 5 (indicating that the Waltons had assets valued at $6,042,000.00 and a net worth of $3,577,500 on January 18, 1984).

Further, JDW engaged in a number of transactions which required her to provide some level of documentation.

As previously noted, JDW transferred her substantial monetary interest in the Meijer Agreement to her sons within one year preceding the filing of her bankruptcy petition.

In addition, JDW engaged in material personal business transactions subsequent to the filing of her bankruptcy petition. JDW entered into an offer to purchase the Homestead with the Bank. *See* Plaintiff's Exhibit 30. The Homestead was subsequently transferred by the Bank to JDW.

After the Bank quitclaimed the Homestead to JDW on October 8, 1992, she executed the Roberts Deed and the McGuire Mortgage. The McGuire Mortgage was granted to secure the payment of $118,753.00. The above transactions raise numerous questions with regard to the adequacy of JDW's financial records in light of the fact that JDW and the Debtor presently reside in the Homestead. These transactions do not represent "minute details".

The Debtor also engaged in a number of transactions which require him to provide documentation.

The Debtor transferred his interest in the Meijer Agreement to his sons within fourteen months of the filing of his petition in bankruptcy without consideration and at a time when he had several large judgments outstanding against him. Further, the Debtor joined in conveying the Roberts Deed and the McGuire Mortgage subsequent to filing a

petition in bankruptcy. Moreover, the Debtor has stated that he has performed business services for others both as a consultant and in bidding on certain property.

In consideration of the above material transactions, the Court concludes that the Waltons were, indeed, required to provide documents or records from which their creditors and this Court could determine their financial condition. Therefore, the Waltons should be denied a discharge as they have failed to produce any recorded information or a plausible explanation for such failure. *See Meridian Bank,* 958 F.2d at 1226 (fear of liens by creditors did not represent adequate justification for failure to maintain records); *Dolin v. Northern Petrochemical Co. (In re Dolin),* 799 F.2d 251 (6th Cir.1986) (gambling and cocaine addiction did not represent adequate justification for failure to maintain records).

In light of the foregoing, it is therefore

ORDERED that the debt due to Ag Credit, ACA which arose from the Loan be, and it hereby is, excepted from discharge. It is further

ORDERED that William J. and Joyce D. Walton be, and they hereby are, denied a discharge.