In re Vernon D. HAAKENSON, Debtor.

**ITT LIFE INSURANCE CORPORATION, American Mutual Life Insurance Company, and United Fidelity Life Insurance Company, Plaintiffs,**

v.

**Vernon D. HAAKENSON, Defendant.**

**Bankruptcy No. 90–05671.
Adv. No. 91–07016.**

United States Bankruptcy Court,
D. North Dakota.

Sept. 23, 1993.

Brad A. Sinclair, Fargo, ND, for plaintiff.

John Stoebner, Minneapolis, MN, for defendant.

## *MEMORANDUM AND ORDER*

WILLIAM A. HILL, Bankruptcy Judge.

This case arises by a Complaint filed February 14, 1991, by which United Fidelity Life Insurance Company (United Fidelity), the sole remaining plaintiff,[1] seeks to have declared nondischargeable losses it and its subsidiary, College Life Insurance Company of America (College Life), allegedly sustained as a result of an insurance premium rebating plan perpetrated by the defendant/Debtor, Vernon D. Haakenson (Haakenson).

Basing its complaint upon sections 523(a)(2)(A), 523(a)(4), and 523(a)(6), United Fidelity is seeking a judgment of nondischargeability in the sum of $2,000,180.00 and College Life is seeking the sum of $72,922.00. United Fidelity's damages allegedly arose when policies it purchased from another insurance company lapsed allegedly because of Haakenson's unorthodox sales methods. Although admitting to a marketing program involving rebating, Haakenson denies all essential elements of the enumerated Code sections and also charges that College Life is not a legitimate party plaintiff.

The case came on for trial on July 21, 1993, and from the evidence adduced at trial, the court makes the following findings of fact and conclusions of law.

### *Findings of Fact*
1.

Haakenson, a long-time resident of Fargo, North Dakota entered the insurance business in 1958 and held membership in a variety of professional and business associations. He held offices in many national and state insurance organizations and was a charter director of the National Association of Life Insurance Brokerage Agencies.

In 1980 he, along with three others, founded a North Dakota subchapter S corporation called Metro Claims, Inc., organized for the purpose of selling and administering various types of insurance including life, long-term care, and group. In 1984, the agency's name was changed to Midwest Benefits, Inc. (MBI) and Haakenson became its sole shareholder, assuming control as chairman and president—positions he consistently held. MBI developed as an insurance brokerage/agency with separate departments for its various insurance activities. With ten office employees and numerous sales agents, it served as general agent for approximately 70 national insurance companies. Throughout its existence MBI issued stock, held regular board meetings, maintained separate bank accounts, books and records and filed regular corporate tax returns. All insurance sales were made under its agency agreement rather than that of individual salesmen. Salary, travel, rent, maintenance, office equipment and other expenses were all paid by MBI and all commission income from sales of various types of insurance was posted as income to MBI which, in turn, paid commissions to its salesmen and posted the payment as a cost of sale. Corporate balance sheets for 1987 through 1989 appear to be carefully maintained and reveal that except for a few months, MBI maintained a positive asset position and was able to meet its current liabilities. As president and office manager, Haakenson received a regular management salary and commissions from the agency based upon his own production as well as that of the corporation generally. He was the highest compensated individual with MBI. Although MBI had two other directors besides Haakenson, it appears from the annual meeting minutes that Haakenson made all decisions and in substance controlled MBI without any meaningful input from the other two. In fact, a directors' quorum was met with attendance by Haakenson and his wife, one of the other directors.

---

**1.** ITT Life Insurance Corporation and American Mutual Life Insurance Company have reached a settlement with the defendant and are no longer parties to the action.

Over the years Haakenson had maintained a business and personal friendship with an individual named Tom Day. Mr. Day, who had been an insurance salesman, suffered a serious car accident which left him a quadriplegic on disability. Although no longer holding an insurance agent's license, Day remained vitally interested in the industry and exercised his sales expertise by working through his wife who, although having little knowledge of the insurance business and not actually involved in insurance sales, did hold an insurance license and signed off as producing agent on insurance applications generated by her husband. It was common knowledge to people associated with the Days, including Haakenson, that sales were generated by Tom with Linda's signature placed on the application by Tom's office help.[2] Day became very interested in promoting insurance sales by means of an insurance product that would permit a reduction or return of the first year premium. In the early 1980's, he and Haakenson had discussions over how commission income could be used to attract customers and enhance sales. Haakenson knew North Dakota law prohibited rebating but also knew that anti-rebating statutes were under attack by consumer groups around the country.[3] The more they talked, the more Haakenson became convinced that it was a good concept which would create a lot of policy holders for MBI. Thus, with market development as his professed objective, Haakenson at a April 1984 MBI board meeting fostered the idea of a "special marketing technique" involving customer discounts or rebates. It does not appear that Mrs. Haakenson or the other director offered any comment on the proposal. At Day's urging, Haakenson contacted North American Life Assurance Company about one of their insurance products which permitted financing the net premium. The product, called the Citation 90 Series, while marketed as a whole life policy had certain tax advantages built in. In fact, it was a minimum deposit type policy with policy value used to help support the premiums. Under such a policy, the policy's annual cash value is used to fund the premium. Thus, according to policy illustrations in evidence, a first year premium of $4,361.00 could be reduced to $2,189.00 by applying the first year loan value of $2,172.00. The second year's premium would be likewise reduced by application of cash values. By this vehicle, an ostensibly whole life policy became in reality a term policy according to Mr. Haakenson.

MBI became a North American general agent in 1984 and between that year and 1988, 300 North American policies were sold, 15 to 25 of which were sold by Haakenson personally and the rest by Tom Day over his wife's signature as an MBI agent. All of the North American customers had their first year's premium returned to them in the following way: MBI through its

---

2. Tom Day apparently wished to remain in the background in order to protect his disability status.

3. In the absence of statutory prohibition, rebates of insurance premiums are not inherently illegal. In North Dakota it is a misdemeanor to rebate a premium or provide any inducement or consideration not provided for in the policy itself. *See* N.D.Cent.Code §§ 26.1-04-03(8)(a); 26.1-04-05; 26.1-04-16; 26.1-25-16; and 26.1-25-18. Recognizing that the insurance industry differs significantly from other industries in which it is allowed, rebating has historically been prohibited by the states in order to address a variety of concerns: preventing company insolvency, unfair discrimination and pricing between insured in the same class, decreased quality of service, avoiding the concentration of insurance business in a few large agencies, and unethical sales practices. *Adamec,* "Premium Rebating: An Unnecessary Evil," 39 Fed'n Ins. & Corp.Couns.Q 3 (1988). Although the Florida Supreme Court in a 1984 decision entitled *Dept. of Insurance v. Dade County Consumer Advocate's Office,* 492 So.2d 1032 (Fla.1986), in affirming the Florida District Court of Appeal held there to be no legitimate state interest justifying anti-rebate statutes, the decision has not been followed in other jurisdictions and its holding has been widely criticized. The general view in other states continues to be that the anti-rebating statutes combat a wide variety of real problems. Tracy A. Bateman, J.D., Annotation, *Insurance Anti-Rebate Statutes: Validity and Construction,* 90 A.L.R.4th 213 (1991). Ignoring the desirability for industry and company stability, some consumer groups and some insurance agents continue to agitate for the elimination of such statutes with the focus being on the consumer.

sales agent filled out an insurance application and submitted it to the company along with an MBI or customer check for the net first year premium. After policy issuance and after receipt of its commission check, MBI, through the sales agent—either Haakenson or Tom Day, issued a check to the customer for 100% of the first year's premium. The first year commission on the policies generally exceeded the premium and Haakenson and Day split all commissions earned on the North American business. In some instances, North American renewal commissions were shared with the customer in succeeding years as well. The files and account ledgers pertaining to the special marketing program were kept in Haakenson's private office separate from other MBI business and not made available except under Haakenson's direction. By 1988, several other MBI employees became aware of the special marketing program being carried out by Haakenson and Day and these individuals told Haakenson it was illegal, that they were concerned that he was jeopardizing MBI's future and if the rebating continued it would eventually ruin the company. Haakenson ignored these expressions of concern and continued on with the special marketing program.

In early 1988, North American changed its dividend scale for the Citation product making it marginally profitable for MBI under the special marketing program. North American at this time also elected to cease writing insurance business in the United States. Thus, Haakenson was obliged to begin looking for a replacement company which could take care of the North American policies as they came due and through an individual named Marshall Podell, allegedly a master agent with Beneficial Standard Life Insurance Company, learned that Beneficial Standard had a product which would be amenable to MBI's ongoing special marketing program. Haakenson testified that Podell was an assistant vice president of Beneficial Standard but Podell himself never testified and the evidence regarding his status is not persuasive. It appears he was some sort of an insurance broker or financial planner—nothing more. In any event, on March 3, 1988, MBI became a general agent for Beneficial Standard. At approximately this time Haakenson stated that he received computer software from Beneficial Standard which would illustrate a universal life policy with an adjustable premium. These illustrations, used by Haakenson and MBI agents (the Days) to market the Beneficial Standard policies, depicted a large first year premium which generated a significant net fund value but no net cash value for the first seven years. As with the North American policies, Haakenson says he believed that pursuant to the illustration, no premium would be due in the second year. Armed with these policy illustrations, and a commission schedule allowing 115% of the first year premium as a commission, MBI through the Days began to actively sell Beneficial Standard products to the exclusion of any other company. Over 50% of MBI's former North American policy holders were converted to Beneficial Standard policies and new customers were signed up—all assured of a 100% return of the first year premium and a promise that no premium would be due in the second policy year. In the case of former North American policy holders, the application for Beneficial Standard coverage in nearly every instance indicated the policy was not replacing any life insurance or annuity currently in force. In fact, the policy was replacing the North American policy but Haakenson testified saying he believed since the North American policy was essentially term in nature it did not need to be referenced in the application. All told there were 317 Beneficial Standard policies written—all with a return on the first year premium and a promise of a free second year. As in the case of the North American rebating, the customer's personal check for the premium was sent to the company and upon receipt of the policy and agent's commission, MBI would refund the premium.

2.

In the fall of 1988, negotiations between Beneficial Standard and the plaintiff, United Fidelity, culminated in the purchase by

United Fidelity of all Beneficial Standard's traditional and universal life policies including those sold through the MBI agency. The value of the block of business purchased was analyzed on the basis of actuarial projections regarding mortality, re-insurance, premiums, dividends and anticipated lapse rates with the assumption being made that, at worst, 12% of the policies in force would lapse at the end of the first coverage year. Based on a detailed actuarial analysis of Beneficial Standard's existing business and actuarial assurances that no significant change was likely, United Fidelity purchased the block of business for $14,750,000.00 on the assumption that the Beneficial Standard policies written by MBI was worth 63% of the annual premium then in force (assuming a 12% lapse rate). Owing to the transfer of statutory reserves to United Fidelity, United Fidelity actually received $40,000,000.00 in cash when it acquired the business. When a policy lapses the statutory reserve is reduced and the reduction becomes net income to the company. Preparatory to the purchase, United Fidelity had met with underwriting people from Beneficial Standard, discussed the business and reviewed applications, but was never advised of and had no idea that all of the policies written by MBI agents had been generated by premium rebating. According to United Fidelity, the company had absolutely no reason to suspect it would not be persistent business. Nor was there anything to suggest the replaced North American policies were anything but term policies. United Fidelity relied on the Beneficial Standard policy applications as being legitimate applications for permanent whole life coverage and did not become aware of the special rebating program until contacted by the North Dakota Insurance Department in 1990.

Agents around the country, including MBI, were first notified by letter dated October 31, 1988, that the sale had occurred and that assumption and administration of the Beneficial Standard policies would occur on January 1, 1989. By this letter, Beneficial Standard agents were advised that all Beneficial Standard's agency contracts were being assumed by United Fidelity and that United Fidelity would assume payment of agents' commissions. A subsequent advisory issued by Beneficial Standard on November 2, 1988, advised that after December 16, 1988, no further applications would be accepted for the insurance policies which MBI had been so successfully using in its special marketing program. In the face of this knowledge, MBI, through the Days, stepped up its sales efforts and managed to sell 149 more Beneficial Standard policies under its special marketing program after October 31, 1988.

In total, 317 Beneficial Standard policies were eventually in force and administered by United Fidelity. All were sold with MBI as general agent. In respect of the 317 Beneficial Standard policies, the total commissions paid to MBI were $3,985,643.00 and of this, $645,225.66 was paid by United Fidelity on Beneficial Standard business assumed and in process of being completed between January 1989 and May 1989.

3.

Things started to come apart as the annual renewal date came around and the Beneficial Standard policy holders, assumed, based upon the policy illustrations, that no payment would be due for the second year of coverage. The ledger or policy illustrations purportedly relied upon by MBI and Haakenson were said by him to be originals generated by Beneficial Standard but United Fidelity officials testified they were not aware of any insurance product that allowed an insured to skip the second year premium. No one from Beneficial Standard testified as to the accuracy of the policy illustrations and, indeed, the court is uncertain as to their origins. In fact, all 317 policies issued by Beneficial Standard themselves contained a statement of policy costs and, while these were flexible premium policies, each policy set out a level annual premium throughout the term—*none* showed a free second year. None evidenced a cash value until at least the third year. By way of example, a $500,000.00 policy depicted a level annual premium of $10,340.00 yet the ledger illustration used for marketing purposes depict-

ed a first year premium of $10,340.00, no premium the second year and then only a $1,150.00 premium in years 3 and 4. All of the policies are similar in this discrepancy, which is extreme to say the least. Nothing in evidence provides a clear explanation of the interplay between the policy illustration and the statement of policy cost accompanying the policy as issued. Haakenson testified that the Beneficial Standard policies were flexible premium policies with cash value being irrelevant and net fund value capable of being used to pay the second year premium. He inquired to Beneficial Standard about his understanding and was given information which led him to believe his interpretation of premium obligation was correct and that the net fund value could indeed fund the second year premium. United Fidelity disagreed with this view and held the Beneficial Standard policy holders to the premium schedule as set out in the policies themselves. Consequently, as each policy holder received a second year premium notice they balked at making the payment and their policies lapsed. Ultimately, of the 317 Beneficial Standard policies assumed by United Fidelity, 295 lapsed within the first year of issuance. This is a 93% lapse rate which is very uncommon in the industry which at the very worst would experience a lapse rate of 30%. Six months into the second policy year, 99% had lapsed. United Fidelity's damages, as will be later discussed, are based upon this extremely high lapse rate.

### 4.

College Life Insurance Company of America is a life insurance corporation which, while wholly owned by United Fidelity, is a separate and distinct corporation with its own insurance products and sales. It came to be involved through another company of which Haakenson was also president. In addition to running MBI, Haakenson was also president of several other companies one of which was MBI Financial Planners, Inc. and which operated out of MBI's offices. It maintained a separate corporate identity from MBI, maintaining its own accounts and filing separate tax returns. In April 1989 MBI Financial became a general agent for College Life and,

through the Days marketed 11 College Life policies under a 100% first year premium rebate carried out in exactly the same fashion as the previous North American and Beneficial Standard programs. All of the College Life policies were sold by the Days on a first year commission of 120%. Commissions paid to MBI Financial by College Life in consequence of rebated College Life policies total $133,794.00.

Although they were flexible term policies, the College Life CAP II policy illustrations showed a level annual premium due each year until year 9. No illustration was introduced suggesting a free second year. When the second year renewal came up, every one of the College Life policies lapsed due to nonpayment of premium. This lapsing provides the basis for College Life's claim as will be discussed.

### 5.

Both Beneficial Standard and College Life in their respective agency contracts established MBI and MBI Financial as independent contractors obligated to conduct their business in conformity with state law and in a manner conducive to the retention of all policies in force. College Life required that the agent not perpetrate any fraud upon the company nor induce directly or indirectly the termination of any policy. Haakenson knew the special marketing programs promoted by MBI and MBI Financial were contrary to accepted insurance practice and against the law. His view, however, was that the insurance consumer deserved a more attractive product and one of the ways to provide it was to return the first year premium. He said that it was never his intent to roll over policies from one company to another and that if United Fidelity had honored or construed the flexible premium policies consistent with the ledger illustrations the policies would still be in force. Yet he was quite willing, despite his long standing as a leader in the industry, to maintain an association with Tom Day who was unlicensed, to allow Day to promote, solicit and sell insurance products for MBI and MBI Financial, to allow non-agents to sign agents'

names to policy applications—applications which he knew were not completely accurate, to promote an insurance product based upon an illustration which, insofar as the court can discern, made absolutely no actuarial sense. Given Haakenson's long involvement in the insurance industry and the fact that he was an officer in various insurance organizations, the court believes it untenable that he legitimately assumed the Beneficial Standard product could remain in force with no premium the second year. The policies themselves made this a highly suspect assumption and Haakenson as agent cannot claim not to know what was in the policy. None of the United Fidelity company employees or actuaries had themselves ever heard of a policy providing for zero premium payment the second year. The court concludes as a matter of fact that Haakenson knew from the beginning that the illustrations were incorrect or at the very least highly suspect. His pattern of conduct speaks volumes and belays any assertion on his part that he did not anticipate wholesale lapsing of policies by nearly every customer that purchased a product under the special marketing plan. Lapsing was inevitable on the anniversary dates.

The North Dakota Insurance Commission undertook an investigation of Haakenson's insurance practices and in 1990 sought the revocation of his license along with other civil penalties for violation of the state anti-rebating laws. This led to a consent order. Haakenson is no longer a licensed agent in any state.

6.

■ United Fidelity gauges its damages, not upon the commissions received by MBI but rather, against the policies anticipated to remain in force when it purchased the Beneficial Standard business and the anticipated premiums on policies expected to remain in force for the normal duration. As previously noted, the purchase value of the business was computed at 63% of the premiums in force which allowed for various actuarial factors including an assumed 12% lapse rate. In arriving at its damages, United Fidelity simply tallied the annual premium on every one of the lapsed policies arriving at a total annual premium on 317 policies of $3,459,128.15. All lapsed within a year and a half except for one surrendered and one death claim paid out. $3,459,128.15 × 63% = $2,180,000.00 which is what United Fidelity prays for in damages. The annual premiums on the 149 policies sold after October 31, 1989, total $1,667,205.00 which, using the same 63% computation, renders an actuarial derived loss of $1,050,339.00.

College Life has calculated its damages in precisely the same fashion based upon lapsing of all 11 policies. The aggregate premiums on the 11 lapsed policies was $115,750.00 of which 63% comes out to $72,922.00. These premium losses, as thus calculated, are not illusionary but reflect what United Fidelity could have expected under the reasonable assumption that the insurance in place was persistent subject only to a normal actuarially defined lapse rate of 12%.

### Conclusions of Law

1.

■ Having concluded that United Fidelity and College Life sustained a cognizable loss is not to say that Haakenson is liable or that if he is liable that liability ought to be based upon the premium losses as calculated or that whatever figure is arrived at is nondischargeable. Both United Fidelity and College Life seek to establish nondischargeable liability by first piercing the corporate veil and then measuring the circumstances of this case against section 523(a)(2)(A), (a)(4) and (a)(6). Each of these recovery premises will be discussed, but before doing so the court will address Haakenson's assertion that College Life is not a proper party to the action. College Life did file a proof of claim but was not named as a party plaintiff in the caption nor is it anywhere mentioned in the body of the complaint. While complaints are to be construed liberally so as to do substantial justice, Rule 17(a) of the Federal Rules of Civil Procedure requires that actions be prosecuted in the name of the real party in interest. *Reule*

*v. Bismarck Public School District,* 376 N.W.2d 32 (N.D.1985). As divulged at trial, it appears College Life is a separate corporate entity from United Fidelity who, in turn, is its sole shareholder. Nothing in the complaint reveals this fact nor do the pleadings suggest any entity is seeking redress except United Fidelity. United Fidelity has not articulated a theory by which College Life can bootstrap its claim on to that of United Fidelity. A shareholder of a corporation has no right to claim as its own a cause of action arising from an injury to the corporation. *Bolivar v. Pocklington,* 137 F.R.D. 202, 205 (D.P.R.1991). It was College Life and not United Fidelity that was in agency with MBI Financial and it was College Life that issued the 11 policies sold by MBI Financial. College Life is the real party in interest to the cause of action seeking nondischargeability of damages arising in consequence of the sale of College Life policies. United Fidelity has not provided the court with any basis upon which to ignore their separate corporate identities for purposes of this litigation. Haakenson has never acceded to litigation piggybacking and asks that College Life be barred from any recovery by means of the instant adversary proceeding. The court agrees and in the absence of College Life being properly joined as a party plaintiff, its prayer for relief will not be entertained.

### 2.

 All of the Beneficial Standard policies giving rise to United Fidelity's losses were sold under MBI's agency agreement with either Haakenson or Linda Day signing off as agent. United Fidelity suggests that Haakenson used MBI and MBI Financial to orchestrate and carry out a fraudulent marketing scheme for which he should be personally liable. Haakenson's defense is that MBI observed corporate formalities and that none of the prerequisites necessary to "pierce the corporate veil" have been established. In the case of *Hilzendager v. Skwarok,* 335 N.W.2d 768 (N.D. 1983), the North Dakota Supreme Court summarized the grounds necessary to justify a court piercing the corporate veil. The court stated:

It is the general rule that officers and directors of a corporation are not generally liable for the ordinary debts of the corporation. However, in *Schriock v. Schriock,* 128 N.W.2d 852, 866 (N.D. 1964), our court stated: '... but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend a crime, the law will regard the corporation as an association of persons.'

*Id.* at 774. *Hilzendager* adopted a series of eight factors which support imposition of individual liability. These factors are:

(1) Insufficient capitalization for the purposes of the corporate undertaking,

(2) Failure to observe corporate formalities,

(3) Nonpayment of dividends,

(4) Insolvency of the debtor corporation at the time of the transaction in question,

(5) Siphoning of funds by the dominant shareholder,

(6) Nonfunctioning of other officers and directors,

(7) Absence of corporate records,

(8) The existence of the corporation as merely a facade for individual dealings.

*Id.* at 774. In the subsequent case of *Jablonsky v. Klemm,* 377 N.W.2d 560 (N.D. 1985), the court said that in addition to finding the existence of several of these factors there must also be present an element of injustice, inequity or fundamental unfairness and that this element is the fundamental basis for disregarding the corporate entity. *Id.* at 564. The Eighth Circuit Court of Appeals in *Froemming v. Gate City Fed. Sav. & Loan Assoc.,* 822 F.2d 723 (8th Cir.1987), found a wholly owned subsidiary corporation to be the alter ego of its parent, saying:

The observation of corporate formality and the capitalization of Sun Service should not obscure the fact that its corporate actions were taken in the interest of its owner, Gate City, and were dominated and directed by Gate City's board of directors and president.

*Id.* at 734. The court, while finding that Sun Service observed corporate formalities, was sufficiently capitalized and was not insolvent, nonetheless concluded such did not preclude disregarding the corporate entity where its dominant shareholder controlled its actions to its own end. In the case at bar, one can hardly conclude that Haakenson, in promoting and carrying through with the special marketing program, was acting in MBI's or MBI Financial's best corporate interest. He knew rebating was illegal in North Dakota and knew the MBI employees who were aware of the program were extremely concerned about its impact upon MBI's future. As president of MBI and as president of MBI Financial, he was signatory to agency contracts by which both entities pledged to conduct business in conformity with state law and in a manner which would best serve policy retention. He encouraged and indeed even solicited the actual participation in the special marketing program by Tom Day who was not even a licensed insurance agent. As with rebating activities, the acting as an agent, consultant or limited insurance representative without a license is contrary to North Dakota law. *See* N.D.Cent.Code § 26.1–26–03. Haakenson could hardly be ignorant of this fact. It also appears he allowed and even encouraged the forging of Linda Day's signature on policy applications. All of these activities were done at the sole direction and pursuant to the will of Haakenson, the president of the two corporations in question and all were clearly contrary to the agency contracts, the laws of North Dakota and sound business and professional judgment. Although Haakenson proffered the notion that the program had as its aim the improvement of business, in fact the only ones to benefit and the only ones who could benefit were Haakenson and Tom Day—they shared the commissions. Haakenson apparently was willing to risk MBI's business reputation, its future and that of its employees for the sake of amassing a block of shaky insurance business. Irrespective of the fact that MBI and MBI Financial observed corporate formalities, it is apparent that the rebating program was carried out at the sole direction of Haakenson and for his sole benefit. Under the principles enunciated in *Hilzendager, supra,* and *Froemming, supra,* this court believes it appropriate that Haakenson be liable for the debts of MBI and MBI Financial.

### 3.

 We will next discuss whether this indebtedness, which is restricted to United Fidelity's loss, ought to be nondischargeable under the United States Bankruptcy Code. The requisite elements attendant to finding a nondischargeability, whether under section 523(a)(2)(A), (a)(4) or (a)(6) must be established by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

11 U.S.C. § 523(a) provides in pertinent part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

. . . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

. . . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

Of the foregoing, the easiest to resolve in regard to the circumstances of this case is section 523(a)(4). United Fidelity, citing *In re Decker,* 36 B.R. 452 (D.N.D.1983), argues that given the circumstances of this case Haakenson as the officer of MBI and MBI Financial ought to be held as the

implied fiduciary of United Fidelity. It points to the special confidence between an insurance company and its agents and the obligations imposed upon the agency through the agency contract. While it is true that a corporate officer is a fiduciary of his corporation, the more general meaning of a fiduciary—that it is a relationship involving trust and confidence, is too broad for bankruptcy purposes. The concept is narrowly defined, applied only to technical or express trusts and not to those arising from contract or the event of the wrongdoing itself. *LSP Inv. Partnership v. Bennett,* 970 F.2d 138, 142 (5th Cir.1992). *See also Re Dloogoff,* 600 F.2d 166 (8th Cir. 1979) (decided under the Bankruptcy Act § 35(a)(4)). The fiduciary relationship referenced in section 523(a)(4) does not extend to trusts imposed on transactions by operation of law or as a matter of equity. The agency relationship between United Fidelity and MBI cum Haakenson did not rise to the level of a fiduciary relationship. Thus, the indebtedness cannot be excepted from discharge on the basis of § 523(a)(4).

4.

 While the standard of proof is identical whether recovery is under § 523(a)(2)(A) or (a)(6), these sections differ in several respects which are salient to the circumstances of this case. Section 523(a)(2)(A) is focused upon money, property, services or the benefits thereof *obtained by* a debtor. Recovery under § 523(a)(6), however, is not premised upon anything being *obtained by* a debtor but rather focuses upon activities of a debtor which cause injury to another entity or to the property of another entity. A § 523(a)(6) action can be maintained by any entity damaged by a debtor's activity and need not be brought in consequence of property obtained from a creditor. *In re Daniels,* 130 B.R. 239, 241 (D.E.D.Ky. 1991). In this sense, the breadth of situations giving rise to a cause of action under § 523(a)(6) is much broader than it is under § 523(a)(2)(A). For example, section 523(a)(6) has been a vehicle for recognizing damages for hazardous waste clean up, *In re Pinkham,* 59 B.R. 209 (Bankr.N.H.

1986); for wrongful appropriation of trade secrets, *In re Springer,* 85 B.R. 634 (Bankr.S.D.Fla.1988); for copyright infringement, *Matter of Elms,* 112 B.R. 148 (Bankr.E.D.La.1990); for unauthorized appropriation of cable television signals, *In re Cohen,* 121 B.R. 267 (Bankr.E.D.N.Y.1990). This distinction has a bearing upon the measure of damages because under § 523(a)(2)(A) damages are defined by the value of that which was fraudulently obtained by the debtor from the creditor. In the case at bar, the only money or property obtained by MBI cum Haakenson from United Fidelity was the commission payments of $645,2225.66. Likewise, College Life would be restricted under § 523(a)(2)(A) to recovery of its commission payments to MBI Financial of $133,794.00. (Assuming, of course, that the requisite elements of § 523(a)(2)(A) have been otherwise established.)

 Because United Fidelity has premised its claim for damages, not upon the commission checks paid, but rather upon a broader theory of business impairment or a loss of profits, its cause of action is better addressed by § 523(a)(6) rather than § 523(a)(2)(A). Although not precisely defined in its brief, it can be gathered from the trial testimony of United Fidelity's officers and actuary expert that because universal life products are sold as permanent insurance, the insurance company expects the policies will remain in force and that the holders continue to make premium payments in accordance with policy premium payment schedule. It is critical to company profitability that such policies be persistent because, given the actuarial vagrancies, such business does not begin to become profitable until it has been on the books for five to six years. Any secret marketing program or scheme which impacts upon this actuarial assumption will affect profitability. Rebating is such a program. While rebating per se is perhaps not illegal in the absence of statutory prohibition, it does nonetheless affect company assumptions about policy persistency. As opposed to normal insurance purchase decisions made by a consumer, a policy pur-

chase induced by rebate can arise from an artificial need or desire for insurance and is often motivated by a "something for nothing" mentality. A consumer is not so much motivated by a desire for long-term insurance coverage or by fidelity to a particular company or product as he is to receiving free coverage. Such a practice, if it infects very many policies, injects instability into a company's projections and instability into the industry generally. This concern came to fruition in a negative sense, when virtually the entire block of business generated by MBI and MBI Financial collapsed after being in force for one year. United Fidelity's computation of damages is not illusionary for the company had no reason to expect that the MBI business would follow anything but the normal actuarially projected course and that most of the 317 policies would remain in force for many years. Indeed, it was this very assumption that caused them to value the policies when purchased from Beneficial Standard. The court believes it was a reasonable assumption to make.

Although the Code itself does not define the concepts of "willful and malicious" as elements of proof under section 523(a)(6), in this circuit it is established that each constitutes a separate element with separate characteristics. In the case of *In re Long,* 774 F.2d 875 (8th Cir.1985) willfulness is defined merely as activity or conduct which is headstrong and knowing. That is, an intentional and deliberate action. *In re Vandrovec,* 61 B.R. 191 (Bankr.D.N.D.1986), *Matter of Langer,* 12 B.R. 957 (D.C.N.D.1981). Maliciousness as defined in the courts, goes beyond mere willfulness and requires proof that the action was done with the knowledge that it would almost certainly cause injury to an entity or the property of an entity. *Long* at 880. This court in the early decision of *In re Fercho,* 39 B.R. 764 (Bankr.D.N.D. 1984) (cited with approval by *Long, supra*) relied upon the Restatement in further defining willful and malicious conduct, to wit:

> All consequences which the actor desires to bring about are intended ... Intent is not, however, limited to consequences

which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result....

Restatement (2nd) of Torts, § 8A, Comment b. In the case at bar, the element of willfulness is easily met. Haakenson himself devised the rebating program and attended to its implementation. He was both the creative and implementing force.

To constitute malice, the evidence must show by a fair preponderance that during the time Haakenson engaged in the rebating scheme he knew it was certain or substantially certain to cause injury to United Fidelity. Some courts have read *Long* as requiring that conduct be targeted at the injured party in order to be actionable malice. The Eighth Circuit itself in the case of *Matter of Hartley,* 869 F.2d 394 (8th Cir.1989) (a case where injury was caused by a lit firecracker being tossed into a gasoline fume-filled basement) wavered on the applicable standard, suggesting that one must intend the consequences of one's actions. Haakenson insists he had no intent to harm United Fidelity and indeed could not have so intended since at the time many of the Beneficial Standard policies were sold, United Fidelity was not in the picture. This argument meshes nicely with *Matter of Hartley* which was later reversed in an en banc decision which unfortunately did not delve into a discussion of the legal theory. *In re Hartley,* 874 F.2d 1254 (8th Cir.1989). A careful reading of *Long* does not suggest that malice is exhibited only when a debtor intentionally injures an entity. It also occurs when the conduct is carried out in the face of knowledge that it is certain or nearly certain to harm the entity. *Long* at 881 & 882. This has been said to be implied or constructive malice and is best illustrated by those cases involving efforts by the Federal Deposit Insurance Corporation, as successor of a failed bank, to recover from a debtor under § 523(a)(6). A debtor in such cases often argues that his actions as a borrower of the bank were not targeted at the FDIC

who at the time wasn't even involved in the loan transaction. Courts nonetheless find malice to exist where a debtor in making false or forged instruments in knowing disregard for the rights of the bank created a situation of potential harm for not only the bank but anyone else coming to rely upon the documents. *E.g., In re Cerar,* 97 B.R. 447 (D.C.C.D.Ill.1989). In *Long, supra,* the Eighth Circuit opined that malice may be discerned from objective evidence. *Long* at 881. Haakenson knew rebating was against the law in North Dakota and, given his long involvement in various professional insurance organizations, he must be held to a higher standard of knowledge than a layman. The activity he engaged in was conceived in the face of general industry-wide knowledge that rebating was not permitted by insurance companies and was extremely irregular conduct. Haakenson is presumed by the court to have known of the egregious nature of his conduct. This knowledge can be inferred from the fact that the scheme was played out close to the vest with a nonlicensed individual and with few other people in MBI's office aware of it until it had been in operation for some time, that rebated files were kept separate, that no company being rebated was advised of it, that it was carried out by means of mathematically irregular policy illustrations which apparently were never corroborated with actual policy premium schedules. This conduct was contrary to the Beneficial Standard agency contract with MBI and was likely to result in injury to any company liable on a rebated policy because wholesale lapsing would undoubtedly occur in the second year. It was extremely foreseeable by Haakenson that the company in possession of the policies would suffer a dramatic loss in premium income once second lapsing occurred. Lapsing was practically guaranteed to occur after the first year due to the incongruity between the policy illustration and what was actually due under the policy premium schedule. Haakenson, as an insurance agent, knew of this discrepancy and knew a large premium payment would come due under the Beneficial Standard policies in the second year yet he continued to market

the policies on the misbegotten theory that no premium would be due in the second year. Even after being advised of the impending sale to United Fidelity and notification that Beneficial Standard policies would no longer be offered, he continued with the special marketing program. The natural consequence of his activities was the loss sustained by United Fidelity. Although these losses are a natural consequence, the evidence does not support the conclusion that Haakenson knew or even suspected that United Fidelity would eventually become the holder of the 317 policies. A bank depositor may well be presumed to know that the bank is insured through the FDIC but a selling insurance agent cannot be presumed to know that the company for whom he serves as agent will sell off its assets. The likelihood of such an event is just too remote to hold Haakenson liable for all losses under a constructive malice theory. After October 31, 1988, however, Haakenson was aware of the sale to United Fidelity and continued marketing of Beneficial Standard products essentially were products of United Fidelity. Nonetheless, he saw to the sale of 149 additional policies to October 31, 1988. The court believes by a fair preponderance of the evidence that after that date, Haakenson knew that the continued sale of Beneficial Standard policies under the special marketing program was certain or substantially certain to injure United Fidelity. The total annual premium on these 149 policies was $1,667,-205.00 and it is on this figure that Haakenson's § 523(a)(6) liability must be figured. Sixty-three percent of $1,667,205.00 is $1,050,339.00. This is the sum which the court believes constitutes the damages occasioned by Haakenson's willful and malicious activity.

5.

■ Having reached this conclusion pursuant to § 523(a)(6) and believing United Fidelity's cause of action is better premised upon that section, it would not be necessary to discuss § 523(a)(2)(A), however, many of the facts which formed a basis

for this court's decision in connection with § 523(a)(6) have relevance to § 523(a)(2)(A).

■ To establish a case under § 523(a)(2)(A) the following five elements must exist:

(1) that the debtor made representation;

(2) that at the time made were known to be false;

(3) that the representations were made with the intention and purpose of deceiving the creditor;

(4) that the creditor relied on the misrepresentations;

(5) that the creditor sustained the alleged injury as a proximate result of the representations having been made.

*In re Ophaug,* 827 F.2d 340 (8th Cir.1987). Courts uniformly agree that the existence of fraud or false intentions can be inferred from the totality of the circumstances. *In re McCoy,* 114 B.R. 489 (Bankr.S.D.Ohio 1990); *In re Dunston,* 117 B.R. 632 (Bankr. Colo.1990). In the case of *In re Schmidt,* 70 B.R. 634 (Bankr.N.D.Ind.1986), the court defined "false pretenses" as conduct which:

[I]nvolves implied misrepresentation [and] conduct intended to create a false impression, as distinguished from a 'false representation' which is an express misrepresentation.

*Id.* at 640. The court in *Matter of Weinstein,* 31 B.R. 804, 810 (Bankr.E.D.N.Y. 1983) noted that silence or the concealment of a material fact can be the basis for a false impression. The *Dunston* court said the false pretenses often involve a series of multiple events, acts or representations undertaken to purposely create a misleading understanding of the transaction and which induces the creditor to depart with something of value. *Dunston, supra* at 641. In the case at bar, Haakenson's special marketing program was hatched and in full bloom by October 1988. As previously discussed in detail, he was aware of its illegal nature and the implications it held for a company in successive policy years, yet he did not advise United Fidelity of the program or of the fact that virtually all Beneficial Standard policies being assumed by it were born of the program. Moreover, he continued on with the program leaving United Fidelity to assume that everything being carried on by its agent, MBI, would be legal and designed to enhance policy retention. Had United Fidelity known of the circumstances, it would not have purchased the MBI block of Beneficial Standard business and would have avoided advancing MBI the commissions on the first year premium. The court is satisfied that each of the requisite elements of § 523(a)(2)(A) have been met, but as recovery would be limited to commissions received by MBI, the court will grant judgment only upon § 523(a)(6), this remedy more closely meeting United Fidelity's prayer for damages.

### Conclusion

For the reasons discussed, IT IS ORDERED that the plaintiff United Fidelity Life Insurance Company have judgment against the defendant Vernon D. Haakenson in the sum of $1,050,339.00 in consequence of losses sustained due to the rebating program and that such sum shall be nondischargeable under § 523(a)(6) of the United States Bankruptcy Code. Interest shall accrue at the rate allowed by North Dakota law. Each party shall bear its own costs and attorneys fees.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**