In re Dennis Robert MONTGOMERY
and Marlys Joan Montgomery,
Debtors.

E.W. Wylie Corporation, Plaintiff,

v.

Dennis Robert Montgomery, Defendant.

Bankruptcy No. 98–31995.
Adversary No. 99–7007.

United States Bankruptcy Court,
D. North Dakota.

July 9, 1999.

Joseph A. Turman, Fargo, ND, for Debtors.

Kip M. Kaler, Fargo, ND, trustee.

### *MEMORANDUM OPINION AND ORDER*

WILLIAM A. HILL, Bankruptcy Judge.

This matter arises by Complaint filed on February 1, 1999, by Plaintiff E.W. Wylie Corporation ("Wylie" or "plaintiff," alternatively), against Debtor–Defendant Dennis Robert Montgomery ("Montgomery"), alleging, inter alia, that Montgomery obtained the use of Wylie's property and services by means of false pretenses, false representations, and actual fraud; that he breached his fiduciary duty to Wylie; and that he converted its property in a knowing, willful, and malicious manner. As relief, Wylie seeks a judgment against Montgomery in the amount of $37,668.46; along with treble damages under North Dakota's RICO Act; a determination that the indebtedness is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6); and its costs and disbursements incurred as a result of this action. Trial was conducted in this matter before the undersigned on May 26, 1999. From the evidence presented, the Court finds the following facts to be material to the issues raised, and makes the following conclusions of law:

### I. FINDINGS OF FACT

#### i. General Background

Wylie is a corporation organized under the laws of the State of Minnesota, with its principal offices located in Fargo, North Dakota. It is involved in the business of transporting goods by truck in interstate

commerce. In this connection, Wylie both owns and leases transport vehicles.

Wylie requires that all of the owner-operators from whom it leases vehicles, and all of its employees who operate its own trucks, possess a commercial driver's licence ("CDL"). In furtherance of this requirement, Wylie, with the help and supervision of Montgomery, established a drivers' training course to qualify potential vehicle lessor-operators and its own employees for such licensing.

Montgomery, age 59, resides in the City of West Fargo, North Dakota. He began his employment with Wylie in 1980 as an over-the-road truck driver. In 1981, Wylie promoted him to the position of Driver Supervisor. In 1984, he assisted Wylie in the organization and commencement of its driver training program and, thereafter, recruited candidates for, and supervised, the training program.

However, Montgomery performed little, if any, actual student training; rather, that function was assigned to Robert Miller ("Miller"), who was hired specifically for the job. Miller was also hired to provide the program's written training materials. Another individual, Robert Kerr ("Kerr"), served as Miller's assistant in training students.

The training program was comprised of two phases. The first entailed classroom training and driving practice in Wylie's training yard. After completing this stage of the program, students tested for their CDLs. In the second phase, trainees were assigned to a driver-trainer, with whom they would spend between four and five weeks in a practicum of actual on-the-road driving. Upon completion of the entire program, the trainees were typically hired by Wylie as drivers.

Program participants were not charged an initial, upfront fee for their training, but, upon gaining employment with Wylie, were required to gradually repay the company for its cost, that is, the sum of $2,500.00 apiece. Company policy prohib-ited the training of any individuals other than the vehicle lessor-operators, Wylie employees, or prospective Wylie employees.

### ii. Unauthorized Training

In Spring 1995, WDAY–TV ("WDAY"), through its General Sales Manager, Mark Von Bank ("Von Bank"), approached Montgomery to help it secure CDLs for several of its employees. Although Montgomery knew that such training was expressly prohibited by company policy, he nonetheless admitted six WDAY employees into the Wylie program, concealing this fact from Wylie management. To formalize their agreement, WDAY and Montgomery executed a contract on June 2, 1995, the terms of which provided, as follows:

> As per our conversation, (6) WDAY–TV employees will go through a series of sessions with Bob Miller in order to receive proper training for a class A drivers [sic] license. The hourly rate to be paid to Mr. Miller will be $14.00 per hour. The total amount to be paid will be figured after the sessions have been completed.
>
> Along with this training, these employees will be able to use the equipment, grounds, and educational aids provided them at no additional charge.
>
> Tom Thompson at WDAY–TV will be responsible for the coordination of the employees with Bob Miller.

Montgomery and Von Bank both affixed their "authorized signatures" to the document. Thereafter, Montgomery provided Miller with a copy of the contract.

Pursuant to the contract, Montgomery understood that the WDAY employees would be using Wylie equipment for their training purposes. Moreover, he knew that Wylie would be liable in the event that a WDAY trainee became involved in an accident while driving Wylie equipment.

The training of the first four WDAY employees took place primarily between June 5, 1995 and August 29, 1995. The training of the remaining two WDAY em-

ployees took place between August 28, 1996 and September 10, 1996. In all then, unauthorized WDAY employee training was conducted over an aggregate span of three and one-half months.

Montgomery neither received compensation nor derived other financial benefit from this unauthorized training. Miller received a total of $4,605.00 from WDAY for his services, that is, 255 of his training hours:

Yet, the training of non-Wylie employees did not end with those from WDAY. After completing the training of the WDAY employees, other non-Wylie individuals received training through the program between July 1995 and September 1996, although at an increased hourly rate. At least nine other individuals received such training, for which Miller received a minimum of $9,257.50 in compensation. Kerr, who also participated in the unauthorized training, received his compensation for the same from Miller.

In all their dealings, Miller never discussed his training of non-WDAY, non-Wylie individuals with Montgomery. For his part, Montgomery had no knowledge of, did not facilitate, took no part in, and derived no benefit from such additional training at the time that it was conducted.

The use value of Wylie's property, and the loss it suffered, aggregated $15,700.00 with respect to the WDAY trainees, and $29,925.00 with respect to the non-WDAY, non-Wylie trainees.[1] Wylie was not compensated for any unauthorized use of its property.

### iii. Montgomery's Bankruptcy and the Instant Action

On November 24, 1998, Montgomery filed his voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. ("Code"). In his Schedule F, entitled "Creditors Holding Unsecured Nonpriority Claims,"

he lists Wylie as holding a claim against him for conversion, the amount of which is contingent and disputed.

On February 1, 1999, Wylie filed its Complaint to Determine Dischargeability of Debt, alleging, inter alia, that Montgomery: (1) represented to one or more third parties that he was authorized by Wylie to set the terms and conditions for training to be provided to said parties and/or their employees; (2) executed one or more contracts on behalf of Wylie whereby unauthorized individuals would receive driver's training instruction utilizing Wylie's facilities and property; (3) arranged and conspired with other employees of Wylie to permit unauthorized individuals to receive driver's training instruction; and (4) permitted unauthorized individuals to receive driver's training instruction from Wylie's employees and through the use of Wylie's facilities and property without advising Wylie's management. The Complaint further states that Montgomery, by the above-described conduct, violated, in a knowing, willful, and malicious manner, his fiduciary duty to Wylie and converted property from Wylie with a fair market value of $37,668.46. Upon these bases, Wylie seeks a judgment in the amount of $37,668.46, along with "[treble damages] as permitted under North Dakota's RICO Statute, together with interest and punitive damages," and a determination that such indebtedness is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (a)(4), and (a)(6).

Montgomery filed his Answer on February 25, 1999. In it, he generally denied the allegations made in the Complaint; moved for its dismissal for failure to state a cause of action upon which relief can be granted; and moved for his costs, disbursements, and attorney fees incurred in connection with this matter.

---

1. At trial, Wylie based these uncontroverted figures upon average truck and trailer rental rates, and fuel rates, over the period of time measured in days that each group of non-Wylie individuals was trained.

## II. CONCLUSIONS OF LAW

### 1. Racketeer Influenced and Corrupt Organizations Claim

█ North Dakota's Racketeer Influenced and Corrupt Organizations Act ("RICO") is found at North Dakota Century Code ("N.D.C.C.") § 12.1–06.1 et seq. In its current form, it is, in essence, a "little RICO" statute, that is, one patterned largely after its federal analogue.[2] *See Burr v. Kulas,* 564 N.W.2d 631, 635–36 (N.D.1997). While the federal RICO Act was codified in 1970, North Dakota enacted its version of the same in 1983.

Since this latter enactment, the North Dakota Supreme Court has had but few occasions to rule on the statute, having done so in only the following two cases: *Burr, supra,* and *Rolin Manufacturing, Inc. v. Mosbrucker,* 544 N.W.2d 132 (N.D. 1996). In both case opinions, the supreme court referred exclusively to the Federal Rules of Civil Procedure in defining the pleading requirements for RICO claims brought pursuant to the North Dakota Act, *see Mosbrucker,* 544 N.W.2d at 138, and referred almost exclusively to federal case law in interpreting the same, *see Burr,* 564 N.W.2d at 636; *Mosbrucker, supra.* Therefore, in its analysis of the state statute, this Court, in addition to referencing both *Burr* and *Mosbrucker,* will follow the same approach.

█ "A RICO claim must 'be pled with the same particularity that is required in the pleading of fraud. Fed. R.Civ.P. 9(b).'" *Mosbrucker,* 544 N.W.2d at 138 (quoting *Taylor v. Bear Stearns & Co.,* 572 F.Supp. 667, 682 (N.D.Ga.1983)). In this respect, Rule 9(b) of the Federal Rules of Civil Procedure provides that, "[i]n all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.

R.Civ.P. 9(b). "'Circumstances' include such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentations and what was obtained or given up thereby." *Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.,* 48 F.3d 1066, 1069 (8th Cir.1995) (quoting *Bennett v. Berg,* 685 F.2d 1053, 1062 (8th Cir.1982), *adhered to on reh'g,* 710 F.2d 1361 (8th Cir.) (en banc), *cert. denied,* 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983)) (internal quotation marks omitted); *accord Mosbrucker,* 544 N.W.2d at 138 ("[Y]ou must plead dates, times, and places of [ ] fraudulent statements, and who made them."); *see also DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990) ("'[C]ircumstances' must be pleaded in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story."); *Melder v. Morris,* 27 F.3d 1097, 1100 n. 5 (5th Cir.1994) (citing *DiLeo,* 901 F.2d at 627).

█ The purpose of this requirement, as enunciated in Rule 9(b), is to: "(1) protect[ ] a defendant's reputation from harm; (2) minimiz[e] 'strike suits' and 'fishing expeditions'; and (3) provid[e] notice of the claim to the adverse party." *Jepson, Inc. v. Makita Corp.,* 34 F.3d 1321, 1327 (7th Cir.1994) (quoting *Vicom, Inc. v. Harbridge Merchant Servs., Inc.,* 20 F.3d 771, 777 (7th Cir.1994)) (internal quotation marks omitted). However, the details necessary to RICO claims are mandated not only by Rule 9(b), "but by the very nature of a RICO claim[,] [f]or '[w]ithout an adequately detailed description of the predicate acts ..., a complaint does not provide either the defendant or the court with sufficient information to determine whether or not a pattern of racketeering activity has been established.'" *Jepson, Inc.,* 34 F.3d at 1328 (7th Cir.1994); *see DeWit v.*

---

**2.** The Organized Crime Control Act of 1970, also popularly known as "RICO," is found at

18 U.S.C. §§ 1961–1968.

*Firstar Corp.,* 879 F.Supp. 947, 972 (N.D.Iowa) (quoting same), *modified,* 904 F.Supp. 1476 (1995).

■ In *Mosbrucker,* the North Dakota Supreme Court discussed several of the elements required of a well-pleaded claim under the North Dakota RICO Act, as follows:

> A necessary ingredient of every successful RICO claim is an element of criminal activity. Civil RICO requires that the defendant's state of mind be the same as that required in a criminal prosecution. The pattern of racketeering activity requires proof of two related predicate criminal acts.

544 N.W.2d at 138 (citations and internal quotation marks omitted). Thus, in light of the foregoing authority, "[a]ny predicate criminal act . . . must be alleged with particularity." *Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Brotherhood Labor Leasing,* 950 F.Supp. 1454, 1463 (E.D.Mo.1996), *amended by* 974 F.Supp. 751 (1997), *aff'd,* 141 F.3d 1167, 1998 WL 121398 (8th Cir. 1998); *see Murr Plumbing, Inc.,* 48 F.3d at 1069 (8th Cir.1995) (applying particularity requirements to allegations of mail and wire fraud); *accord Mosbrucker* ("[P]redicate acts must be criminal acts. Characterizing some event as criminal does not make it so. . . . Therefore, it is necessary that either a prior conviction or probable cause be alleged with reference to the predicate acts.").

■ In the instant matter, Wylie, by only the vaguest reference in its Complaint, seeks treble damages against the debtor-defendant "as permitted under North Dakota's RICO Statute[.]" In none of the Complaint's nine counts does Wylie make mention of this aspect of its claim; rather, it does so only in its prayer for relief. Yet, even there, as quoted above, it fails to expressly assert detailed RICO violations and also neglects to properly cite to North Dakota's RICO Act itself or to any of its various provisions.

Accordingly, the basis for Wylie's claim, "as permitted under North Dakota's RICO Act," is insusceptible to precise identification or definition from its Complaint. Wylie's Complaint thus fails to satisfy the pleading requirements for a RICO claim in any conceivable way, and will, in this respect, be dismissed.

2. 11 U.S.C. § 523

■ Wylie draws upon three subparts of § 523(a) in making its claim that Montgomery's debt should be excepted from discharge, to wit, (a)(2), (a)(4), and (a)(6), all of which read, in pertinent part, as follows:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> . . . .
>
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> . . . .
>
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;
>
> . . . .
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

11 U.S.C. § 523(a)(2)(A), (4), & (6). Exceptions to discharge must be strictly construed against the creditor, in furtherance of the policy of providing the debtor with a fresh start in bankruptcy. *See Geiger v. Kawaauhau (In re Geiger),* 113 F.3d 848, 853 (8th Cir.1997), *aff'd,* 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998); *Werner v. Hofmann,* 5 F.3d 1170, 1172 (8th Cir. 1993) (per curiam). Thus, the burden of proof in the instant matter is Wylie's, the standard for which is proof by a preponderance of the evidence. *See Grogan v.*

*Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991); *In re Slominski,* 229 B.R. 432, 435 (Bankr.D.N.D.1998) (creditor bears burden of proof by a preponderance of the evidence with regard to § 523(a)(2)(A) and (a)(6)); *Werner v. Hofmann In re Hofmann,* 144 B.R. 459, 463 (Bankr.D.N.D.1992) (preponderance of the evidence standard applied with respect to § 523(a)(4)), *aff'd,* 161 B.R. 998 (D.N.D. 1993), *aff'd,* 5 F.3d 1170 (8th Cir.1993).

i. Section 523(a)(4): Fiduciary Status

 To prevent the discharge of Montgomery's debt under the first prong of § 523(a)(4), it was incumbent upon Wylie to establish the following two elements by a preponderance of the evidence: (1) that a fiduciary relationship existed between Montgomery and Wylie; and (2) that Montgomery committed fraud or defalcation in the course of that fiduciary relationship. *See Werner v. Hofmann (In re Hofmann ),* 144 B.R. 459, 463 (Bankr.D.N.D. 1992), *aff'd,* 161 B.R. 998 (D.N.D.1993), *aff'd,* 5 F.3d 1170 (8th Cir.1993).

 Under the first element, the definition of "fiduciary," for purposes of § 523(a)(4), is a question of federal law. *See Tudor Oaks Ltd. Partnership v. Cochrane (In re Cochrane ),* 124 F.3d 978, 984 (8th Cir.1997); *cert. denied,* —— U.S. ——, 118 S.Ct. 1044, 140 L.Ed.2d 109 (1998); *accord Mills v. Gergely (In re Gergely ),* 110 F.3d 1448, 1450 (9th Cir.1997). Within this confine, the term is limited to instances involving express or technical trusts, and, thus, is more narrowly defined than it is under the general common law. *See In re Cochrane,* 124 F.3d at 984; *Barclays Am./Bus. Credit, Inc. v. Long (In re Long ),* 774 F.2d 875, 878 (8th Cir.1985); *Bollinger v. Polk (In re Polk ),* 183 B.R. 1020, 1022 (Bankr.E.D.Mo.1995); *ITT Life Ins. Corp. v. Haakenson (In re Haakenson ),* 159 B.R. 875, 887 (Bankr.D.N.D. 1993); *accord Miller v. J.D. Abrams Inc. (In re Miller ),* 156 F.3d 598, 602 (5th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1250, 143 L.Ed.2d 347 (1999); *see*

*also 4 Collier on Bankruptcy* ¶ 523.10[1][C], at 523–73 (Lawrence P. King ed., 15th ed. rev. 1999) ("[S]ection 523(a)(4), as it relates to a debtor acting in a fiduciary capacity, does not generally apply to frauds of agents, bailees, brokers, factors, and partners, and other persons similarly situated.") (footnotes omitted). Indeed, a fiduciary relationship can only arise from an express or technical trust "imposed before and without reference to the wrongdoing that caused the debt." *In re Cochrane,* 124 F.3d at 984 (quoting *Lewis v. Scott (In re Lewis ),* 97 F.3d 1182, 1185 (9th Cir.1996)) (internal quotation marks omitted); *accord In re Gergely,* 110 F.3d at 1451.

 With respect to the characteristics of such trusts, this Court previously observed, in *In re Hofmann,* as follows:

> Generally, an express trust is created by an agreement between two parties to impose a trust relationship. The typical characteristics of an express trust generally include an explicit declaration of a trust with a trust res, and an intent to create a trust relationship.... [C]ourts have even acknowledged the existence of a technical trust where a statute imposes fiduciary obligations on a party.... [A merely contractual relationship] is less than what is required to establish the existence of a fiduciary relationship. Where no fiduciary relationship exists, no fraud or defalcation can arise from the nonexisting fiduciary relationship as mandated under [§ ] 523(a)(4).

144 B.R. at 463 (citations omitted). Thus, "[t]he broad, general definition of fiduciary—a relationship involving confidence, trust, and good faith—is inapplicable." *In re Gergely,* 110 F.3d at 1450 (quoting *Ragsdale v. Haller,* 780 F.2d 794, 796 (9th Cir.1986)); *see also In re Long,* 774 F.2d at 878 ("The Code does not reach constructive trustees, designated as such because of misconduct.").

 As to the provision's second element, the United States Court of Ap-

peals for the Eighth Circuit recently adopted the following definition of the term "defalcation" in *In re Cochrane:*

Defalcation is defined as the "misappropriation of trust funds or money held in any fiduciary capacity; [the] failure to properly account for such funds." Under [§ ] 523(a)(4), defalcation "includes the innocent default of a fiduciary who fails to account fully for money received." ... An individual may be liable for defalcation without having the intent to defraud.

124 F.3d at 984 (quoting *Lewis v. Scott,* 97 F.3d 1182, 1186 (9th Cir.1996)) (internal quotation marks omitted).

■■■ In the instant matter, Wylie has not established the applicability of the fiduciary prong of § 523(a)(4) to Montgomery's actions—no express or technical trust has been demonstrated between Montgomery and Wylie. Rather, and to borrow from the language of *In re Long,* their relationship has been shown to be "intrinsically more contractual than fiduciary," and thus, Wylie "cannot soundly invoke the fiduciary bar against discharge of [Montgomery's] obligation." *In re Long,* 774 F.2d at 879. This does not end the Court's inquiry, however.

 ii. Section 523(a)(4): Embezzlement and Larceny

■■■ Two alternate prongs remain under § 523(a)(4), those of "embezzlement" and "larceny," either of which, once established, would operate to bar the discharge of Montgomery's debt to Wylie, the amount of which will be later discussed. Because Montgomery's possession and control of Wylie's property—that is, its training program, materials, yard, and vehicles—was lawful and derived from his supervisory position over the same, embezzlement, rather than larceny, is the appropriate context for this next inquiry. *See Miller v. J.D. Abrams Inc. (In re Miller),* 156 F.3d 598, 602 (5th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1250, 143 L.Ed.2d 347 (1999); *Werner v. Hofmann*

*(In re Hofmann),* 144 B.R. 459, 464 (Bankr.D.N.D.1992), *aff'd,* 161 B.R. 998 (D.N.D.1993), *aff'd,* 5 F.3d 1170 (8th Cir. 1993), *see also* 9B Am.Jur.2d *Bankruptcy* § 3117 (1991) ("Larceny differs from embezzlement in that larceny requires that the original taking of the property be unlawful, whereas with embezzlement the initial taking of the property is lawful but the subsequent possession becomes unlawful.").

■■■ For purposes of § 523(a)(4), the Eighth Circuit has defined embezzlement to mean, "the 'fraudulent appropriation of property of another by a person to whom such property has been entrusted or into whose hands it has lawfully come.' " *Belfry v. Cardozo (In re Belfry),* 862 F.2d 661, 662 (8th Cir.1988); *see First Nat'l Bank v. Phillips (In re Phillips),* 882 F.2d 302, 304 (8th Cir.1989) (quoting *Belfry);* *accord In re Hofmann,* 144 B.R. at 464 (citing *Belfry* and *Phillips); see also* 9B Am.Jur.2d *Bankruptcy* § 3117 (1991) ("Embezzlement, for purposes of 11 USCA § 523(a)(4), is the fraudulent appropriation of property of another by a person to whom such property has been entrusted or into whose hands it has lawfully come."). "Implicit in a claim of 'embezzlement' ... under § 523(a)(4) is a degree of malevolent intent." *Neff v. Knodle (In re Knodle),* 187 B.R. 660, 664 (Bankr.D.N.D.1995); *cf. In re Miller,* 156 F.3d at 602 ("To meet the definition of 'embezzlement,' there must be proof of the debtor's fraudulent intent in taking the property."). Thus, "[a] creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud." *Brady v. McAllister (In re Brady),* 101 F.3d 1165, 1173 (6th Cir.1996); *see also In re Belfry,* 862 F.2d at 663 ("Obligations sufficient to support a claim of embezzlement are ones which make the debtor's discretionary use of the [property], prior to complying with the obligations, improp-

**924**

er."); *In re Hofmann,* 144 B.R. at 464 (quoting *Belfry* ).

■ In the instant matter, Wylie has satisfied its burden of proof as to one portion of its claim against Montgomery, by demonstrating that he fraudulently appropriated property owned by Wylie and to which he was entrusted, or of which he was lawfully possessed, *in connection with the training of the WDAY employees.* Specifically, and in this respect, Montgomery appropriated Wylie's training program, facility, and vehicles for a use contrary to that for which they were intended—and, moreover, for which they were entrusted to him—under circumstances indicating fraud.

In this last respect, on the element of fraud, Montgomery himself conceded that at the time he allowed the appropriation to the WDAY employees, he was aware that such action was contrary to Wylie's company policy. He was also aware that Wylie would be liable for any accident sustained during the course of the unauthorized training. Moreover, the contract which Montgomery entered into with WDAY specifically contemplates the conversion, waste and consumption of various Wylie assets in connection with training the WDAY employees—indeed, the contract is substantially premised upon these misappropriations. Yet, Wylie received no reimbursement for these misappropriations of its assets. Instead, the loss to the company served as a boon to the unauthorized trainees and their trainers—to wit, Miller and Kerr—alike, with the former, WDAY, paying only an hourly wage to the trainers and avoiding the costs of vehicle rental, fuel, mileage, and insurance, and the latter deriving considerable income from the same. Finally, Montgomery concealed the unauthorized activities from Wylie. Thus, in sum, the Court finds that Wylie has met its burden of proof in its action against Montgomery under § 523(a)(4) insofar as it pertains to Montgomery's liability for Wylie's losses—that is Montgomery's

debt—connected with the training of WDAY employees.

However, the losses Wylie sustained as a result of the training of non-Wylie, non-WDAY individuals cannot be ascribed to Montgomery. In this connection, the evidence supports this Court's determination that Montgomery was not even aware of this training, and that it was undertaken, at great profit, by others than himself. This lack of nexus runs through each of Wylie's claims under § 523(a), proving fatal to each in the same manner. Therefore, in light of this, and having already determined that Montgomery's debt to Wylie for the training-related losses it sustained in connection with his misappropriations of its property for WDAY employees is nondischargeable pursuant to § 523(a)(4), this Court's inquiry need proceed no further on this subject.

### III. CONCLUSION

Accordingly, and for the foregoing reasons, IT IS ORDERED THAT Plaintiff E.W. Wylie Corporation is awarded judgment in its favor and against Debtor–Defendant Dennis Robert Montgomery in the amount of $15,700.00. IT IS FURTHER ORDERED THAT the debtor is DENIED a discharge in bankruptcy pursuant to 11 U.S.C. § 523(a)(4) for the amount of this indebtedness. Additionally, Plaintiff's claim for RICO damages under the North Dakota RICO Act is DISMISSED. All other requests in this matter, including requests for costs and attorney fees, are DENIED.

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

**SO ORDERED.**